473 So.2d 167 (1985)
Don Henry PACE
v.
STATE of Mississippi.
No. 55545.
Supreme Court of Mississippi.
July 10, 1985.
*168 Thomas L. Kesler, Sams & Kesler, Columbus, for appellant.
Edwin Lloyd Pittman, Atty. Gen. by Leyser Q. Morris, Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
PATTERSON, Chief Justice, for the Court: Part I.
WALKER, Presiding Justice, for the Court: Part II.

PART I.
This is an appeal by Don Henry Pace from his conviction of arson by the Circuit Court of Lowndes County. He was sentenced to six (6) years confinement in the custody of the Mississippi Department of Corrections.
The Bottom Dollar Saloon burned on April 27, 1983. Pace, the appellant, was the owner of a competing saloon called "The Rig" located across the street from the newly opened and competing business establishment.
Terry Rhudy was a witness for the state. He testified that Pace offered him $250.00 to burn the "Bottom Dollar." The offer was accepted and Pace suggested that Rhudy climb onto the roof of the "Bottom Dollar" and pour gasoline down the center attic ventilator shaft. According to Rhudy, in the early morning hours of April 27, 1983, by chance, he met Pace at a Jr. Food Store in Vernon, Alabama. Pace suggested that it was a good night to burn the "Bottom Dollar" and the two left in Pace's car to obtain a container for the gasoline. After returning to the Jr. Food Store with a gallon jug, Pace bought the gasoline to fill it and left for his home.
According to Rhudy he then took an automobile belonging to Becky Hester, the night clerk at the Jr. Food Store, without her permission; drove to "The Rig" and parked behind it. He then walked across the street to the rear of the "Bottom Dollar" and climbed upon the roof, poured the gasoline down the venilator shaft, and ignited it. Thereafter he fled the scene, returned the car, and went to his home in Vernon, Alabama. Thereafter Pace paid Rhudy $80.00 for the fire and deducted the remainder of the promised $250.00 from a bar bill that he owed Pace.
This testimony was corroborated in part by Becky Hester, who testified that she saw Rhudy and Pace having a conversation in the Jr. Food Mart Store in the early morning hours of April 27, 1983. She also stated that she had left the keys in her car on that night.
Rhudy's sister, Glenda Hood, testified that she saw Pace come to the house where she and her brother lived and give Terry some money. Maxie Ellis, a State Fire Marshal, testified that his investigation revealed the "Bottom Dollar" was not forcibly entered and in his opinion it burned from the roof toward the ground.
Pace asserts the following as the basis for reversal.
1. The jury's verdict was against the overwhelming weight of the evidence;
2. The prosecutorial misconduct in reintroduction of incompetent evidence was prejudicial as to deny Pace a fair trial;
3. The trial court denied him the right to cross-examine a state's witness concerning possible bias, prejudice, or to make a proffer of this testimony; and
4. The trial court's improper comments to the jury constituted reversible error.
The first two assignments for reversal can be answered in brief. The evidence of the state amply supports Pace's conviction of arson. Rhudy's testimony is not *169 unreasonable and it was believed by the jury. Moreover, it is consistent with the fire marshal's testimony concerning the manner in which the saloon was burned. It was also corroborated by the testimony of both Hester and Hood. We think no citation of authority is necessary to reannounce the age old principle that the jury is the trier of fact and if their verdict is supported by the evidence, we will not disturb it. So it is here. Additionally, after close examination of the record, we detect no prosecutorial misconduct which would require reversal.
The next assignment of error concerns the scope of cross-examination permitted the defendant of Pam Franks, a state witness. On direct examination Ms. Franks testified that Pace told her that he had heard that she was the one who had reported him to the police. According to her, Pace then stated that he did not believe this was so because of what he knew about her past that could ruin her marriage. When asked by the prosecutor if she feared Pace she responded that she did not fear him physically but that she had concern for her marriage.
On cross-examination defense counsel sought to elicit testimony about those things in her past known to Pace, that could ruin her marriage. On objection by the prosecutor to these questions, the trial court ruled that those events in her past were irrelevant and would not permit cross-examination on the subject.
We think there can be little, if any, argument that a criminal defendant is entitled to full and adequate cross-examination of the witnesses against him. However, this general rule of law is subject to an exception when the testimony sought to be elicited concerns the credibility of a witness. In Tokman v. State, 435 So.2d 664, 668 (Miss. 1983), we stated:
In Shanklin v. State, 290 So.2d 625, 627 (Miss. 1974), we stated: "A defendant can, of course, question a witness to determine his credibility as a witness; but as to how far afield the testimony may be extended is largely within the sound discretion of the trial judge." ...
It follows, we think, that witnesses are not to be subjected to undue embarrassment or harassment unless necessary to the trial, for to do so would likely cause members of the public to be hesitant to become witnesses. Gilmer v. State, 271 So.2d 738 (Miss. 1973). Moreover, cross-examination on an irrelevant point is not permitted. See Blair v. State, 445 So.2d 1373 (Miss. 1984). Presently the defendant contends that he could have shown by cross-examination the extent of Ms. Franks' bias and from this, her credibility as a witness.
We are of the opinion the trial courts must be invested with the discretion to judicially evaluate and determine these points of evidence as they arise. Indulging that discretion here, we do not think a detailed exploration of embarrassing events in the witness' past would have been of any probative value. It need be remembered that the witness was introduced by the state and her fear of the witness was revealed to the jury. Under this circumstance, we conclude the trial court acted properly in sustaining the state's objection and preventing defense counsel from further development of the issue in a proffer outside of the jury's presence.

PART II.
WALKER, Presiding Justice, for the Court: Part II.
The final assignment of error has to do with the trial court's comments to the jury. The issue centers around an exchange between the trial judge and a juror when the judge asked that the jury be brought out after it had retired to consider its verdict. The exchange follows:
THE COURT:
Ladies and Gentlemen of the jury, have you reached a verdict?
A JUROR:
No, sir.
*170 THE COURT:
Are you hopelessly deadlocked:
A JUROR:
I think so.
THE COURT:
If we let you go back in the jury room and consider your verdict a while longer, do you think there'd be a reasonable hope that you would reach a verdict?
A JUROR:
No, sir; I don't think so.
THE COURT:
So, you're hopelessly deadlocked and there's no point in going back in the jury room; is that what you're telling us? If you're hopelessly deadlocked and there's no point in going back into the jury room, it's pointless for me to send you back in there. So, the only thing else to do is to declare a mistrial.
Would you tell us  Now, I don't want to know which person voted which way; I would like to know how you stand in number, how many for conviction and how many for acquittal. I don't want to know who voted which way.
A JUROR:
Eleven to one.
THE COURT:
Eleven to one. You feel sure that there's no point in going back.
A JUROR:
There doesn't appear to be.
A JUROR:
I don't think we really know, Judge.
A JUROR:
I agree; I don't think we really know.
THE COURT:
I'm going to let you go back in the jury room for a little while longer. You may retire to the jury room, please.
The appellant contends that the court violated the holding of Sharplin v. State, 330 So.2d 591 (Miss. 1976) by telling the jury "... I would like to know how you stand in number, how many for conviction and how many for acquittal. I don't want to know who voted which way." The juror responded, "Eleven to one."
In Sharplin we stated:
... We hold therefore that the mere request and receipt of the jury's numerical division without reference to guilt or innocence does not coerce the jury and is not error. We believe that the possibility of coercion, if any, lies in the trial judge's conduct and comments after he receives the division, that is, whether the judge merely affords the jury additional time to deliberate or whether he attempts to force a verdict by suggestive or coercive measures.
The object of the jury system is to secure a verdict by a comparison of views and by agreements among the jurors themselves. Although the verdict of the jury should represent the opinion of each individual juror, it does not follow that opinions of jurors may not be changed by conference with each other in the jury room... .
330 So.2d at 596.
The appellant places emphasis on that part of the Sharplin opinion which says: "... We hold therefore that the mere request and receipt of the jury's numerical division without reference to guilt or innocence does not coerce the jury and is not error." However, the appellant's emphasis is misplaced. What the court was condemning in that case was "the Allen charge", Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896), in any of its various forms. Justice Sugg, speaking for the Court, went on to say: "We believe that the possibility of coercion, if any, lies in the trial judge's conduct and comments after he receives the division, that is, whether the judge merely affords the jury additional time to deliberate or whether he attempts to force a verdict by suggestive comments or coercive measures." (Emphasis added). Any question put to the jury asking them how they stand numerically necessarily implies "as to guilt or innocence" because they are deliberating on that issue. Although it would have been better for the judge to *171 simply ask "How do you stand numerically," we find nothing harmful, suggestive, or coercive about the question as he phrased it.
For the reasons stated above, the judgment of the trial court is affirmed.
Affirmed.
Part I: All Justices concur.
Part II: WALKER and ROY NOBLE LEE, P.JJ., and PRATHER, ROBERTSON and ANDERSON, JJ., concur.
PATTERSON, C.J., and HAWKINS, DAN M. LEE and SULLIVAN, JJ., dissent.
PATTERSON, Chief Justice, dissenting as to Part II.
With deference I reach a different conclusion from the majority on Part II. I dissent largely because of my belief that Sharplin v. State, 330 So.2d 591 (Miss. 1976), has established the proper standard by which the trial courts of this state can cope with exchanges between jurors and themselves after the jury has retired to consider its verdict. The majority opinion initiates the first erosion of Sharplin and the first step in this Court's return to "the Allen charge." See Allen v. United States, 164 U.S. 492, 17 S.Ct. 154, 41 L.Ed. 528 (1896). Other erosions will follow so that Sharplin's specificity, and thus its effectiveness, will be lost, in my opinion.
The trial judge asked, "I would like to know how you stand in number, how many for conviction and how many for acquittal. I don't want to know who voted which way." (Emphasis added.) A juror responded, "Eleven to one." The sequence of the judge's query, "How many for conviction and how many for acquittal," places the word "conviction" before the word "acquittal" in the statement. The response "eleven to one" in sequence with the query, means there were eleven jurors for conviction and one for acquittal.[1] In Sharplin, in pertinent part, we stated, "We hold therefore that the mere request and receipt of the jury's numerical division without reference to guilt or innocence does not coerce the jury and is not error." 330 So.2d at 596. As stated by the majority, all inquiries by a trial judge in a criminal case as to the jury's numerical division has to relate to acquittal or conviction, but this overlooks that such inquiries should be "without reference to guilt or innocence." It is my opinion the court's inquiry of the jury did refer to guilt or innocence and this is prohibited by the precise language of Sharplin, in which case, incidentally, the numerical division of the jury was nine to three.
The remaining question is whether such action constitutes reversible error. In the case of Green v. State, 97 Miss. 834, 838, 53 So. 415, 416 (1910), this Court held,
He [trial judge] cannot be too careful and guarded in language and conduct in the presence of the jury, to avoid prejudice to either party. [Citation omitted.] The court will not stop to inquire whether the jury were actually influenced by the conduct of the judge. All the authorities hold that if they were exposed to improper influences, which might have produced the verdict, the presumption of law is against its purity; and testimony will not be heard to rebut this presumption. It is a conclusive presumption.
And see, Sharplin v. State, 330 So.2d at 591, in its full context.
Perhaps it is inevitable that judges would differ on the point before us because none knows what transpired among the jurors after they returned to the jury room except they returned a guilty verdict shortly thereafter. We must necessarily conjecture the effect the trial court's inquiry had when the jurors were immediately returned to the jury room for further consideration. I think it likely the full weight of the trial court's direction to return and consider their verdict fell squarely upon the sole juror for acquittal. The vote was eleven to one and the court's query probably influenced *172 his vote to join the others to convict. For this reason I would reverse.
HAWKINS, DAN M. LEE and SULLIVAN, JJ., join this opinion.
NOTES
[1] Would the jury have been returned to their room for further consideration had the response been "one to eleven?" I think not, or at least it is highly unlikely.