632 So.2d 936 (1994)
Leslie BRENT
v.
STATE of Mississippi.
No. 90-KA-0498.
Supreme Court of Mississippi.
February 17, 1994.
*937 Jeffrey A. Varas, Hazlehurst, for appellant.
Michael C. Moore, Atty. Gen., Pat S. Flynn, Asst. Atty. Gen., Jackson, for appellee.
En Banc.
HAWKINS, Chief Justice, for the Court:
Leslie Brent has appealed his conviction in the Circuit Court of Copiah County of felonious child abuse and sentence to ten years imprisonment. Finding no error, we affirm.

*938 FACTS

When Lemerle Gilmore married Brent in December, 1984, she had three children, Cerita, Tenecia and Danny Gilmore. Following her marriage, Cerita and Tenecia lived with Lemerle's mother, Mrs. Eartha Lee Gilmore. Danny lived with Lemerle and his stepfather, Brent. Lemerle and Brent had one child born of their marriage, Leslie Brent, Jr.
In December, 1989, Danny was nine years of age, in the third grade at Crystal Springs School, and a below average student.
At 7:00 a.m. on the morning of December 11, 1989, Lemerle dropped Danny and the baby, Leslie, off at Mrs. Gilmore's on her way to work. When she returned that evening, Danny told her that he had stolen his grandmother's ring. When they got home, Danny was punished by his mother for stealing the ring. The next morning, after Danny arrived at his grandmother's house, he told his sister Cerita that Brent on the previous night had beaten him and then burned him with a spoon. Danny showed her the burn marks and in turn, Cerita told her grandmother, who then treated his burns.
While in school on the morning of December 12, 1989, Danny was summoned from his classroom by Dorothy Stokes, principal of Crystal Springs Elementary School. Danny told Stokes and a social worker that he had been burned with a spoon at home by his stepfather. According to Stokes, the burn resembled "the head part of a spoon" and she could think of no way that Danny could have been burned like that while in school.
Later in the day Danny was taken to the Crystal Springs Police Department by his aunt, Sadie Edwards. Billy Mangold, a licensed social worker employed by the Department of Human Services, was at the station on another matter when Danny was brought in. After interviewing Danny, Mangold took photographs of the physical injuries.[1] Danny was not taken to a doctor that day because there had been a severe snow storm. After interviewing, examining and photographing him, Mangold was convinced that Danny was an abused and neglected child, and contacted the Youth Court for his removal from the Brent home.
Following Mangold's investigation, on December 12, 1989, Danny was removed from the Brent home, and placed with his aunt Sadie Edwards.
Brent was arrested and charged with felonious child abuse, and on April 4, 1990, was indicted by a grand jury of Copiah County for felonious child abuse in violation of § 97-5-39(2). Trial was held on April 17, 1990.

Trial
During the course of the trial, there was voir dire examination of Danny's ability to accurately testify. After questioning from both sides, the Court determined that Danny was competent to testify. Part of Danny's testimony was that his mother had punished him by beating him "with a big black extension cord." In addition, Danny testified that later that same night, after his mother punished him, Brent beat him with a "hard stick" and then put his mother in the back room of the house. Following this, Danny was told to remove his shirt. Brent then opened a drawer, removed the baby's spoon, heated it over the gas stove, and stuck it on Danny's chest. Danny also testified that his lip was broken open as result of Brent's beating. Danny prepared himself for bed but did not reveal to his mother what had happened.
Q: Would you tell the folks why you didn't tell your Mother.
A: `Cause she told me don't tell nobody, so I didn't tell nobody but my sister.
Q: Who told you not to tell anybody?
A: My mother.
Q: Who was it you told?
A: My sister.
Q: And what happened when you told her?
A: I was scared `cause I had told my sister.
Q: Why were you scared because you had told your sister?

*939 A: Mother told me don't tell anybody.
(R. 63-64)
Cerita Gilmore, Eartha Lee Gilmore, and Sadie Edwards were called to testify on behalf of the State. All three stated that on December 12, 1989, Danny revealed the bruises and burn marks to them. Cerita and Sadie also testified that they had previously observed bruises all over the child and that Danny was in such condition "very often."
Lemerle Brent testified that she was the sole provider for her family as she was the only one working during that time. She testified that on the night of December 11, 1989, she punished Danny for stealing the ring by whipping him with a switch. According to Lemerle, her whipping caused Danny's broken lip. Lemerle also testified that she first learned of the burn marks on Danny's chest the evening of December 12 when she arrived to collect her children from Eartha Gilmore's house. Lemerle stated that she was in the bathroom with Danny when he showered that morning but that she only saw marks from the whipping. Finally, Lemerle testified that Brent in no way punished Danny that night and that she did not believe that he burned him.[2] She did admit to having a baby spoon in the house for feeding Leslie, Jr.
After Danny was removed from the Brent home, it was two to three weeks later before Lemerle saw her son again. She and Hazle McKinley, Brent's mother, went to see Danny at Sadie Edwards' house. Mrs. Edwards testified that she did not invite the two women to her home and that "they was talking to Danny trying to convince him to talk to Leslie's lawyer by telling him that he didn't burn him." Lemerle Brent testified that the only contact she had with Danny after he was removed from the home was "after they had sent for me, I went by the house one time."
Brent testified on direct examination that at no time during his marriage to Lemerle did he discipline or punish Danny. On cross-examination, however, he admitted to whipping Danny during the early years of the marriage. Brent emphatically denied burning or administering punishment of any kind to Danny on the night of December 11, 1989.
Mangold testified that Danny was a frightened little boy who feared that he might be placed back in the home with Brent; and that it was fairly common for abused and neglected children not to complain to others because of their fears.

Juror Misconduct
Following the testimony of several State witnesses, during the lunch recess defense counsel learned from some source that a juror was discussing the case with his fellow jurors. He brought it to the attention of the court. A hearing was then conducted in chambers. Mangold, the social worker who had investigated the case, first testified that J.D. Lewis, father-in-law of the sheriff of Copiah County, had told him that morning prior to being selected as a juror that if he "was selected as a juror that the state would not win another damn case." Mangold also said he had informed the prosecuting attorneys of this statement. The state had nonetheless accepted Lewis as a juror.
David Bagley, the bailiff for the jury, then testified that when the jury was being taken to lunch, Lewis told him that "we going to raise hell in the jury room when we get up there." Bagley reprimanded him, "J.D., don't say that." Then he heard Lewis talking to the other jurors at lunch, and again reprimanded him. Bagley continued:
Coming on out [from lunch] he said "I got four on my side now." I said, "J.D., that ain't right," I said "sit in there and listen to the evidence and then make up your mind." He said, "I done made up my mind." (Emphasis added).
In response to further questioning by defense counsel as to whether he had heard Lewis say anything else, he replied, "He was talking too low and laughing. You know how he is about laughing."
*940 The district attorney then moved for a mistrial or in the alternative that Lewis be replaced as a juror:
BY MR. SMITH:
Your Honor, the State would move for a mistrial, or in the alternative to strike Juror Lewis and replace him with the alternate. I will state for the record that I was aware that he made a comment this morning, but I know J.D. Lewis and felt like he was doing nothing more than talking, but it appears that he's a man that I know to be a talker and bragger and so forth, and I really didn't take it seriously; apparently, though, he has done more than that. He has actually violated his oath as a juror and has talked to some of the other witnesses, in fact has made the comment that he's got four on his side.
Defense counsel responded:
BY MR. VARAS:
Your Honor, if the State had problems with Mr. Lewis, they should have struck him off the panel. This information was available to them prior to selecting the jury. (Emphasis added).
The circuit judge then noted that because the statement made by Lewis to Mangold was made prior to being selected as juror, and the State, being apprised of this remark, nevertheless accepted him as a juror, the court was not going to declare a mistrial because of this statement. As the record shows, the court was not going to give any relief whatsoever to the State for Lewis's adverse remarks prior to trial. The circuit judge went on to state, however, that "the conversation during the noon hour upsets me considerably."
Defense counsel then stated that if the Court felt improper statements had been made, a mistrial, rather than simply dismissing Lewis as a juror, would be appropriate.
The district attorney responded that he had no idea whether the four Lewis claimed to have with him were for conviction or acquittal.
The court went on to note that Lewis was well known, the father-in-law of the sheriff, a compulsive talker, all of which was known to the State before choosing him. The court concluded that Lewis should be discharged as a juror and the trial continue.
Defense counsel objected, saying that either Lewis should be permitted to sit, or a mistrial granted. "Your Honor, my objection would be that the panel has been tainted, that there should be a mistrial as opposed to excusing one juror. I don't know what's been said or what may have been done."
Defense counsel continued: "I just wanted to note my objection for the record, that I am having to pay for the State's mistake in this matter and I don't, you know, and I don't appreciate having to do that."
BY THE COURT:
Well, you also accepted Mr. J.D. Lewis 
BY MR. VARAS:
 Right, and I still accept Mr. Lewis to go forward.

(R. 49) (Emphasis added).
The court then excused Lewis, and polled the remaining jurors as follows:
BY THE COURT:
Ladies and gentlemen of the jury, if there has been any remark made by any person outside of this courtroom pertaining to this case, will you and each of you promise me that you will not consider that at all in arriving at your verdict in this case. Will you do that? If you will, hold up your hand please.
Let the record show that all twelve held up their hand. Very well. Miss Tarver, we're going to promote you up on the jury, and you will take that seat back there.

LAW

I. REFUSAL TO DECLARE MISTRIAL
We address first whether the court abused its discretion in refusing to declare a mistrial.
From the record, it is clear that it was the State which first wanted a mistrial. The circuit judge said that the State having accepted a juror knowing he was adverse, the court was not about to declare a mistrial *941 because of his pretrial remarks. The circuit judge was concerned about his misconduct during trial. It is also clear that defense counsel had no objection to Lewis remaining as juror. What he did object to was that if Lewis was going to be replaced, that the court declare a mistrial. Defense counsel was satisfied with the jury as constituted, and never asked that Lewis be removed.
Defense counsel's motion for a new trial contains the following assignments as to the removal of Lewis:
5. The Court erred by removing one of the jurors from the panel when there was insufficient evidence for the removal. (Emphasis added).
6. The jury panel was contaminated when one of the jurors was removed and the Court should have declared a mistrial.
Brent's objection at trial and in his motion for a new trial was that the circuit judge erroneously removed a juror who was favorable to his side. There was clearly no prejudicial "tainting" of the jury against Brent. If Lewis's comments had been to convict, his statement that he had four jurors with him may have justified a mistrial upon motion by the defense. But, the comments of Lewis were almost surely to acquit.[3]
Therefore, the question is whether or not the court committed error in removing Lewis, not that Lewis had contaminated the jury against Brent.
Counsel never attempted in his motion for a new trial to have Lewis questioned as to whether any of his comments were directed against Brent. If they had been, we might have an entirely different story.
So, the question we have on this appeal is not whether the jury was contaminated against Brent. All the evidence suggests it was the other way around. Lewis was well known to defense counsel and the State. If there had been any suggestion that Lewis had tried to influence the jury to convict Brent, defense counsel would most assuredly have asked the Court to make some inquiry and a hearing had on the question in his motion for a new trial. Gladney v. Clarksdale Beverage Co., Inc., 625 So.2d 407 (Miss. 1993).
The real question is whether or not the court committed reversible error in removing Lewis at all, not in refusing to declare a mistrial.
Whether the court declared a mistrial or simply removed Lewis as a juror, either way, Brent was deprived of a juror favorable to him.
Was Brent entitled to have Lewis remain on the jury in view of the fact that the State had already accepted him, knowing he had expressed the intention never to vote to convict, regardless of the facts of the case? This is the question. The circuit judge was clearly unhappy with the State, and would never have excused Lewis except for the blatant misconduct observed by the bailiff after Lewis was on the jury panel.
Lewis's conduct and statements as a juror were contemptuous and blatantly violated the court's instructions to the jury. To hold that a circuit judge cannot remove a juror who is disrupting the evidentiary process by declaring to all the remaining jurors before either side has completed putting on its case just how he is going to vote, and actively soliciting their support is to say the court has no discretion at all. It was the State, not the defense which ran the risk in not having a mistrial declared. Lewis's statements were against the State.
The decision to declare a mistrial is within the sound discretion of the trial judge. See Arizona v. Washington, 434 U.S. 497, 512, 98 S.Ct. 824, 834, 54 L.Ed.2d 717 (1978); Grandberry v. Bonner, 653 F.2d 1010 (5th Cir.1981). To find error from a trial judge's failure to declare a mistrial, there must have been an abuse of discretion. Jones v. State, 398 So.2d 1312, 1318 (Miss. 1981); Schwarzauer v. State, 339 So.2d 980, 982 (Miss. 1976). Trial judges in this state are further guided by Uniform Criminal Rules of Circuit *942 Court Practice 5.15, Mistrial, concerning when a mistrial is required:
The court shall declare a mistrial upon the defendant's motion if there occurs during the trial an error or legal defect in the proceedings, or conduct inside or outside the courtroom, resulting in substantial and irreparable prejudice to the defendant's case.
U.C.R.C.C.P. 5.15.
The conversation between Mangold and J.D. Lewis was prior to Lewis being accepted as a juror by the State. Lewis did converse with other jurors during the noon recess, but was subsequently removed from the panel and the remaining jurors were instructed not to consider his remarks in reaching their verdict, and polled individually. When a verdict is attacked, some taint therein must be shown. White v. State, 142 Miss. 484, 107 So. 755 (1926). Once Lewis was removed, the trial proceeded without incident. There is a strong presumption that a jury will follow instructions given to them by the court. McFee v. State, 511 So.2d 130, 136 (Miss. 1987), citing Arteigapiloto v. State, 496 So.2d 681, 685 (Miss. 1986); Cabello v. State, 490 So.2d 852, 857 (Miss. 1986); Sand v. State, 467 So.2d 907, 911 (Miss. 1985). There was no abuse of discretion in refusing to declare a mistrial.

II. SUFFICIENCY OF THE EVIDENCE
Brent also challenges on appeal, as he did at trial in motions for a directed verdict and a new trial, the sufficiency of the evidence to convict. Brent's guilt or innocence was a proper jury issue.

III. DANNY'S COMPETENCY AS A WITNESS
Rule 601 of the Mississippi Rules of Evidence governs the general rules of witness competency. This rule provides that every person is competent to be a witness except as restricted by the specific exceptions within the rule itself. "Before allowing a child witness to testify, the trial judge should determine `that the child has ability to perceive and remember events, to understand and answer questions intelligently and to comprehend and accept the importance of truthfulness.'" Mohr v. State, 584 So.2d 426, 431 (Miss. 1991) (citing House v. State, 445 So.2d 815, 827 (Miss. 1984)). Danny passed the test.

IV. QUESTIONING OF DANNY'S CHARACTER
During the cross-examination of Danny, the defense posed the following questions:
Q: Now, you took your grandmother's ring, is that correct?
A: Yes, sir.
Q: Did you ever take anything else from your grandmother's house?
A: No, sir.
Q: Has your mother ever had to whip you before that for taking things?
A: Yes, sir.
Q: What things?
Q: For what?
BY MR. SMITH: Your Honor, I would object at this time to this line of testimony as neither relevant or material to the issue before the jury.
BY THE COURT: I'm going to sustain under Rule 608(b).
BY MR. VARAS: Your Honor, I think I'm entitled to bring out matters that reflect on the child's behavior.
BY THE COURT: Well, I have already ruled. Under 608 you can only go into matters that concern the character of truthfulness.
(T. 66-67)
We must begin with the observation that, having secured an answer to the question that the witness had been punished for taking things, defense counsel seems to have been clearly delving into irrelevant matter with the inquiry as to what things were taken. Moreover, even if there could be some relevancy in the nature of the "things" taken we have no way of making that determination because no proffer was made. For these reasons this assignment of error must fail. We discuss the matter further, however, *943 because of the circuit judge's ruling on Rule 608(b) of M.R.E.
Rule 608(b) provides:
Specific Instances of Conduct.
Specific instances of the conduct of a witness, for the purpose of attacking or supporting his credibility, other than conviction of a crime as provided in rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of a witness (1) concerning his character for truthfulness or untruthfulness, ...
M.R.E. 608(b).
Thus, the rule provides discretionary authority for the trial judge to permit upon cross-examination inquiry into specific acts of misconduct of a witness "if probative of truthfulness or untruthfulness," and concerning a witness's character for "truthfulness or untruthfulness." The comment to the rule notes that this exception goes beyond pre-rules decisions, and allows "impeachment by specific acts which are something other than criminal convictions when the character trait of truthfulness of the witness being examined is under attack."
While the circuit judge may have been mistaken in his observation that "taking things" did not concern a character trait of truthfulness, he did not abuse his discretion in sustaining an objection to this line of questioning regarding the child's behavior. Mississippi Rule of Evidence 608(b) comes verbatim from the Federal Rules of Evidence, and we go to the federal courts' interpretation for guidance.
Rule 608(b) has been called a "complex rule." Leonard, Appellate Review of Evidentiary Findings, 70 N.C.L.Rev. 1155, 1167 (1992). Today we give guidance to trial courts in its application.
It is elementary that evidence offered for one purpose might be inadmissible, yet admissible when offered for another. M.R.E. 105; See U.S. v. Martinez, 962 F.2d 1161, 1165 (5th Cir.1992); U.S. v. Abel, 469 U.S. 45, 56, 105 S.Ct. 465, 471, 83 L.Ed.2d 450 (1984); Lubbock Feed Lots v. Iowa Beef Processors, Inc., 630 F.2d 250, 261 (5th Cir.); reh'g denied 634 F.2d 1355 (5th Cir.1980).[4] In construing evidentiary rules, it is necessary that we be precise, because it is quite easy to mix an evidentiary apple in with an evidentiary orange.
In this case we are faced with this question: Under what circumstances may one cross-examine a witness under Rule 608(b) about specific instances of past conduct not resulting in a conviction when the sole purpose of such line of questioning is to destroy the witness's credibility for truthfulness? When will it be permitted, and what is its effect? These questions embrace our entire inquiry in this case.
Prior to promulgating the M.R.E., cross-examination of a witness about specific instances of past conduct not connected with the case was considered irrelevant and impermissible when the purpose was to impeach his character. Baxter v. Rounsaville, 193 So.2d 735 (Miss. 1967); Tippit v. Hunter, 205 So.2d 267 (Miss. 1967); Bailey v. State, 67 Miss. 333, 7 So. 348 (1889); Stewart v. State, 263 So.2d 754 (Miss. 1972); Pierce v. State, 213 So.2d 769 (Miss. 1968); Gallion v. State, 469 So.2d 1247, appeal after remand 517 So.2d 1364 (Miss. 1985).[5] Rule 608(b) offers a window of opportunity, albeit small.
*944 The rule first tells us that specific instances of a witness's conduct for the purpose of either attacking or supporting his credibility which did not result in a conviction "may not be proved by extrinsic evidence." M.R.E. 608(b). As noted, this has always been the rule in this state. Rule 608(b) continues, however, to inform us that specific instances of past conduct not resulting in a conviction may "in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness ..." M.R.E. 608(b).
What are the guides to a trial court in making this determination?
The first guide, of course, is the rule itself. The proffered conduct must be such as to reflect upon the witness's character for truthfulness. If the past conduct did not involve lying, deceit, or dishonesty in some manner, it cannot be inquired into on cross-examination Sayles v. State, 552 So.2d 1383, 1385-86 (Miss. 1989); Pace v. State, 473 So.2d 167, 169 (Miss. 1985). The trial court has no discretionary authority to permit inquiry by cross-examination into conduct not involving truthfulness.
Assuming the trial court finds the proposed inquiry probative of the witness's character for veracity, in exercising his discretion whether or not to permit it, the court must look to two other Rules of Evidence, 611 and 403.[6]
Rule 611 tells us that the court must exercise reasonable control over the mode and order of trial testimony and presentation of evidence to promote attaining the truth, and to avoid "needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." M.R.E. 611.
The trial judge must also consider the proffered evidence under the strictures of Rule 403 which states that "relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury ..." M.R.E. 403.
The comment to F.R.E. 608(b) states:
Particular instances of conduct, though not the subject of criminal conviction, may be inquired into on cross-examination of the principal witness himself or of a witness who testifies concerning his character for truthfulness. Effective cross-examination demands that some allowance be made for going into matters of this kind, but the possibilities of abuse are substantial. Consequently safeguards are erected in the form of specific requirements that the instances inquired into be probative of truthfulness or its opposite and not remote in time. Also, the overriding protection of Rule 403 requires that probative value not be outweighed by danger of unfair prejudice, confusion of the issues, or misleading the jury, and that of Rule 611 bars harassment and undue embarrassment. *945 F.R.E. 608, comment (2) at page 552 (emphasis added).
We commend to all trial judges that when a party seeks to cross-examine a witness about specific instances of past conduct probative of veracity under Rule 608(b) that the judge make his findings under Rule 403 of record. Our ability to accord deference to the trial court's discretion in either permitting or denying such Rule 608(b) cross-examination rests upon specific findings of the trial court of it's weighing process under Rule 403.[7]
Admission of evidence of past conduct poses special hazards and danger, and should only be admitted when it is necessary to do so to "ascertain the truth," and unfair prejudice is not imposed, especially upon the accused. Unlike pre-rules decisions, Rule 608(b) authorizes impeachment of the accused by such cross-examination once he takes the stand. State v. Walton, 673 S.W.2d 166 (Tenn. 1984).
Procedurally, before counsel attempts an inquiry on cross-examination as to specific acts of past conduct not resulting in a conviction he should inform the trial judge that he intends to do so. The trial judge can then conduct a hearing outside the presence of the jury. It should be emphasized that Rule 608(b) does not authorize a fishing license, but counsel must have specific instances of past conduct about which he proposes to cross-examine the witness, and inform the trial judge of them. Following this, the trial judge can determine first if the conduct reflects upon the witness's honesty, and if so, weigh the probative value against the danger of unfair prejudice, as required under Rule 403 and also determine whether admission of the evidence will advance the ascertainment of the truth in the case.
Finally, it should be noted that the party cross-examining a witness about past instances of conduct is bound by the witness's answer. He is not permitted to offer evidence in rebuttal to contradict it. U.S. v. Johnson, 968 F.2d 765, 766-67 (8th Cir.) cert. denied ___ U.S. ___, 113 S.Ct. 481, 121 L.Ed.2d 386 (1992); U.S. v. Leonardi, 623 F.2d 746, 757 (2d Cir.), cert. denied 447 U.S. 928, 100 S.Ct. 3027, 65 L.Ed.2d 1123 (1980); U.S. v. Rabinowitz, 578 F.2d 910, 912 (5th Cir.1978); Hayes v. U.S., 407 F.2d 189, 193-94 (5th Cir.), cert. dismissed 395 U.S. 972, 89 S.Ct. 2133, 23 L.Ed.2d 777 (1969); Peel v. U.S., 410 F.2d 1141-42 (5th Cir.1969).
We find no error in the circuit judge's exclusion of the line of questioning of Danny which defense counsel was attempting in this case. It offered no specific instances and was no more than a fishing expedition. Unless there has been some predicate laid for it, counsel is not permitted to ask a witness on cross-examination open-ended questions such as has he ever stolen or lied or committed wrongful acts of one kind or another. This runs afoul of both Rule 611 which requires a court to protect a witness from harassment or humiliation[8] as well as Rule 403 which requires the cross-examination to be about specific instances. Moreover, counsel made no proffer of what he expected to prove. M.R.E. 103(a)(2).
Finding no reversible error, we affirm.
CONVICTION OF FELONIOUS CHILD ABUSE AND SENTENCE OF TEN YEARS AFFIRMED.
PRATHER, P.J., and PITTMAN, BANKS, JAMES L. ROBERTS, Jr. and SMITH, JJ., concur.
BANKS, J., concurs with separate written opinion joined by SULLIVAN and JAMES L. ROBERTS, Jr., JJ.
*946 DAN M. LEE, P.J., dissents with separate written opinion joined by McRAE, J.
McRAE, J., dissents with separate written opinion joined by DAN M. LEE, P.J.
BANKS, Justice, concurring:
I concur in the majority disposition of all issues. Because I feel that the trial court handled the question of the removal of juror Lewis in an insufficient manner I write separately to note my concern.
Brent argues here that the trial court erred in removing juror Lewis and not declaring a mistrial. There are two areas of inquiry. The first is whether the state made a sufficient showing to have Lewis removed. The second inquiry is whether, assuming that Lewis should have been removed based on the allegations made, the trial court sufficiently inquired as to damage done by his actions and the appropriate level of remediation for any such harm.
We have observed that,
[e]xcept in rare cases, a juror once seated and sworn is on the case for the duration. Those rare occasions include two prescribed by statute. Miss. Code Ann. § 13-5-67 (1972) reflects the court's authority to remove a seated juror who becomes "unable" or "disqualified" to perform his or her duties. The statute contemplates such removal "prior to the time the jury retires to consider its verdict."
Folk v. State, 576 So.2d 1243, 1249 (Miss. 1991). As used here the word "disqualified" has been given a greater scope than statutory minimum qualifications. Myers v. State, 565 So.2d 554, 557 (Miss. 1990). We have approved removal of jurors who have, for example, been discovered to have failed to disclose significant information in response to unambiguous questions during voir dire, id., and jurors who were revealed to have had some prior connection with the case to be tried. Davis v. State, 512 So.2d 1291 (Miss. 1987); Russell v. State, 220 So.2d 334, 337 (Miss. 1969).
The burden is, of course, on the party seeking removal of a juror to demonstrate that there are adequate grounds for disqualification. Here, the state sought removal of a juror who was known to the state and court personnel, and who was known, prior to his acceptance to have made statements to the effect that he was biased against the state. Clearly, the state waived any objection that it had to this juror on account of the prior expression. The question then is whether the statement of the bailiff as to his observations is sufficient without more to dictate removal of the juror.
The bailiff testified that he heard the juror talking about the case but could not ascertain what was said. He related the juror's assertion that he had four other jurors leaning his way. There was no intimation as to which way this was. Based on the prior statements one might suspect that he leaned against the state, but that is by no means certain. Lewis' pre-trial mouthings should not, in my view, be given the preclusive effect accorded them by the majority.
When faced with an assertion of juror misconduct or other event potentially affecting a fair trial the trial court is duty bound to make a thorough inquiry to determine the circumstances and substance of the alleged event and whether the rights of a party have been prejudiced. See, Phillips v. State, 462 So.2d 981, 990 (Ala.Cr.App. 1984). Here, while it must be acknowledged that the trial court had evidence upon which to conclude that juror Lewis had violated his admonition not to discuss the case prior to deliberations, the court made no inquiry of Lewis as to the extent and substance of any conversation that he may have had. Lewis was not given an opportunity to rebut or explain in any way the allegations made by the deputy sheriff. Whether Lewis, in fact, discussed the case in any significant manner with other jurors, or had made up his own mind, was simply not shown on this record.
Assuming arguendo that the trial court was justified in crediting the testimony of the bailiff without more, the question arises whether it took sufficient steps to eliminate the possibility of prejudice, given the facts which it accepted as true. The testimony was to the effect that Lewis had made up his mind and indicated that four others had as well. No inquiry was made of other jurors as to whether they had expressed an opinion *947 to Lewis or anyone else as to how the case should be decided. Moreover, the admonition given the remaining jurors could easily been interpreted as referring to conduct of persons other than jurors "outside the courtroom". No reference was made to juror Lewis or anything that he might have said.
The state sought a mistrial as alternative relief. The defendant sought a mistrial in preference to the dismissal of Lewis and complained of the possible taint of the remaining jury. To find error in a trial judge's failure to declare a mistrial, there must have been an abuse of discretion. Jones v. State, 398 So.2d 1312, 1318 (Miss. 1981); Schwarzauer v. State, 339 So.2d 980, 982 (Miss. 1976). Trial judges in this state are further guided by Uniform Criminal Rules of Circuit Court Practice 5.15, Mistrial, as to when a mistrial is required:
The court shall declare a mistrial upon the defendant's motion if there occurs during the trial an error or legal defect in the proceedings, or conduct inside or outside the courtroom, resulting in substantial and irreparable prejudice to the defendant's case.
U.C.R.C.C.P. 5.15.
The problem that we have here is that there was an insufficient inquiry to determine the question whether there was irreparable prejudice and even to determine the appropriate remediation for any prejudice that did occur. While we cannot say that the court abused its discretion in failing to declare a mistrial, in my view, the court committed error by failing to fully investigate the incident in question. That error is excused here because Brent sought no further investigation. He did not ask the court for further inquiry. As the majority notes, he sought only to keep Lewis and, failing that, a mistrial. Because the court should not ordinarily be put in error for failure to respond to a request not made, I concur with the majority disposition of this case.
SULLIVAN and JAMES L. ROBERTS, Jr., JJ., join this opinion.
DAN M. LEE, Presiding Justice, dissenting:
I cannot concur in the result reached by the majority and, accordingly, I join the dissent of Justice McRae. I write separately only to voice my disagreement with the misapplication of M.R.E. 608(b) to the facts of this case.
The majority opinion and the actions of the trial judge reflect an erroneous presumption. Both appear to presume that Danny, a minor witness nine (9) years of age, is more credible than an adult witness, therefore, the motive for truth or veracity, or the intent to testify falsely is not entitled to be explored as fully as if the witness were an adult. This simply is not a correct interpretation or application of our rules of evidence.
During the cross-examination of Danny, the following colloquy transpired:
Q: Now, you took your grandmother's ring, is that correct?
A: Yes, sir.
Q: Did you ever take anything else from your grandmother's house?
A: No, sir.
Q: Has your mother ever had to whip you before that for taking things?
A: Yes, sir.
Q: What things? For what?
BY MR. SMITH: Your Honor, I object at this time to this line of testimony as neither relevant or material to the issue before the jury.
BY THE COURT: I'm going to sustain under Rule 608(b).
BY MR. VARAS: Your Honor, I think I'm entitled to bring out matters that reflect on the child's behavior.
BY THE COURT: Well, I have already ruled. Under 608 you can only go into matters that concern the character of truthfulness.
(emphasis added).
Evidently, both the trial judge and the majority of this Court choose to ignore the relevancy of the objected line of questioning to truthfulness or the likelihood of telling the truth, as well as the materiality of the frequency of "whippings". It should go without *948 saying that, from time to time, a child can easily adopt bad sentiments towards his parents for administering "whippings" to him. Also, it is not difficult to conclude that the more frequent the "whippings" occur, the probability or likelihood of bad sentiments may also increase. Last in this logical chain of reasoning, it does not require any great stretch of one's imagination to infer that a child of nine (9) years may retaliate against his parents by making false statements against them in order to "get back" at them.
Since Danny was on cross-examination, Rule 608(b) M.R.E. allowed his credibility to be attacked with specific instances of conduct by Danny which were probative and concerned with his truthfulness or untruthfulness. The questioning at issue apparently was designed to show the reaction of Danny's parents towards his taking things, therefore, providing a "motive" or "intent", in Danny's mind, to retaliate against them by testifying falsely  an exercise which is precisely probative of truthfulness or untruthfulness.
Even though the questioning only concerned "whippings" administered by Danny's mother, we cannot say that the follow-up questions would not have concerned "whippings" given by Leslie Brent. Nor can we know that testifying falsely against Brent was not Danny's method of retaliating against his mother.
I do not say that I disbelieve the testimony of Danny. However, the trial jury was the trier of fact in this matter and the line of questioning which was terminated by the trial judge certainly could have aided the jury in determining the likelihood of Danny's truthfulness or untruthfulness. Consequently, the trial judge erred in excluding evidence probative of the possibility that Danny had a "motive" or "intent" to testify falsely.
McRAE, J., joins this opinion.
McRAE, Justice, dissenting:
One of this Court's responsibilities is to entertain questions of whether a defendant has received a fair and impartial trial, and under the circumstances of this case regarding Juror Lewis' misconduct, I cannot find that Leslie Brent was afforded a fair and impartial trial. Because both prosecution and defense asked for a mistrial upon being informed of the content of Juror Lewis' comments, and because the trial court failed to adequately inquire as to the nature of those comments, a mistrial should have been granted in order to preserve the defendant's right to a fair and impartial trial.
Further, when Juror Lewis was excused from jury duty for violating his oath as a juror, the court's questioning of the remaining jurors did not constitute a "careful examination" as required by our law. The trial judge's remark to disregard statements made by anyone outside of the courtroom could possibly have led the remaining tainted jurors to believe they must hold contrary to what Lewis had said since they had no knowledge of whether Lewis had been merely excused or punished. Brent has a fundamental right to a fair and impartial jury, a jury who has not been influenced in any way outside of the evidence presented at trial. Absent an explicit showing of a fair and impartial jury, a mistrial should be granted. I, therefore, dissent.

I. MISTRIAL
It is a deeply grounded principle of our Constitution that one is entitled to a trial before a fair and impartial jury, as well as a fair trial. In Stevens v. State, 513 So.2d 603, 606 (Miss. 1987) Justice Sullivan, dissenting, reminded us of the importance of that right when he penned:
If our ancient faith in the institution of the jury as the great protector of the rights of the individual is to have any meaning, we must insist that the jurors themselves, if nothing else, be fair and impartial. Anything less makes a travesty of our concept of the jury trial.
513 So.2d at 606.
The record in the instant case indicates that both the prosecutor and counsel for the defense asked the trial judge for a mistrial when statements made by Lewis, a former bailiff, were brought to their attention by Bagley, the bailiff for the Brent trial. The record reveals the following:

*949 BY MR. BAGLEY: On coming on out he said `I got four on my side now.' I said `J.D., that ain't right,' I said `sit in there and listen to the evidence and then make up your mind' He said `I done made up my mind.'
The record further reveals that both parties then requested a mistrial.
BY MR. SMITH: (the prosecutor): Your Honor, the State would move for a mistrial, or in the alternative to strike Juror Lewis and replace him with the alternate. I will state for the record that I was aware that he made a comment this morning, but I know J.D. Lewis and I felt like he was doing nothing more than talking, but it appears that he's a man that I know to be a talker and bragger and so forth, and I really didn't take it seriously; apparently, though, he had done more than that. He had actually violated his oath as a juror and had talked to some of the other witnesses [jurors], in fact has made the comment that he's got four on his side.
* * * * * *
BY MR. VARAS (defense attorney):
Your Honor I would state if the Court feels improper statements were made, then I think the panel would have been tainted by the statements, and I feel that a mistrial as opposed to dismissing him, would be appropriate.
BY MR. SMITH: Your Honor, I will say that frankly we don't know whether he's got four of them with him for conviction or acquittal. I have no idea.
BY MR. VARAS: That's the part that worries me, scares me, Your Honor.
* * * * * *
BY THE COURT: And Mr. J.D. Lewis was certainly not an unknown person. He had served as bailiff in this Court for a number of years. He's the father-in-law of the Sheriff of this county, and he is a compulsive talker, and all of that is known to the State's attorneys before they accepted him as a juror. I will excuse him from the jury and move the thirteenth juror on the panel, and let the case continue.
BY MR. VARAS: Your Honor, my objection would be that the panel has been tainted, that there should be a mistrial as opposed to excusing one juror. I don't know what's been said or what may have been done.
BY THE COURT: Well, if it was said, it was said by a juror to a juror. I will be glad to instruct the jurors to disregard anything Mr. J.D. Lewis may have said, but I do not feel that at the present time that it justifies a mistrial.
Lewis was brought into the courtroom and the following colloquy took place:
BY THE COURT: Mr. Lewis. it has been reported to me that you made some statements prior to getting on the jury to a person about what you would do it you got on this jury, and that you have been making some statements during the noon hour as to what you're going to do and so forth, and so I'm going to remove you from this jury and you may go. You do not have to come back the rest of the week.
BY JUROR J.D. LEWIS: Thank you, sir.
(emphasis added). The trial judge then excused Lewis. Mr. Varas once again expressed his concern that the whole panel had been tainted, to which the judge replied, "Well, I hope that the jurors  we will expect them to do what they are instructed to do." The judge and Mr. Varas decided the jury should be specifically instructed, but Mr. Varas remained skeptical that the instruction would cure any defects.
The jury returned to the courtroom and the following instruction was given:
BY THE COURT: Ladies and gentlemen of the jury, if there has been any remark made by any person outside of this courtroom pertaining to this case, will you and each of you promise me that you will not consider that at all in arriving at your verdict in this case. Will you do that? If you will, hold up your hand, please.
All twelve jurors raised their hands. Unfortunately, this general admonition, coupled with the dismissal of Lewis, was not sufficient to cure the damage done by Lewis' statements. The general instruction which was given carried the subtle impression that the trial court did not like Lewis' opinion and perhaps the jurors were left with the feeling *950 that the trial judge believed they should find the opposite of Lewis' comment, i.e., for the defendant. Obviously, without anything further, the jury was tainted and the prosecution and defense agreed, as they both asked for a mistrial.
Although the trial judge is vested with discretion in the decision to grant a mistrial, this Court has evinced certain guidelines which should be followed when the trial court is presented with allegations of juror misconduct. The majority opinion does not even acknowledge the existence of these procedures. Because these guidelines were not followed, the trial judge could not have accurately assessed the potential damage done by the improper statements made by Juror Lewis.
This Court has held that the trial judge's discretion to decline to grant a mistrial should be upheld and that there is no abuse of discretion in cases where the trial judge carefully examines the person who made the improper statements and the remaining jurors as to what had happened.[1] In Williamson v. State, 512 So.2d 868 (Miss. 1987), Justice Sullivan, writing for the Court, commented on the importance of a careful examination by the trial judge of the effects of improper statement made to jurors:
The most fundamental and sacred rights [sic] secured for the criminal defendant is [sic] the right to a trial before a fair and impartial jury. Johnson v. State, 476 So.2d 1195, 1209 (Miss. 1985). Because of this, once the jury is empaneled, all cautionary measures possible should be taken to prevent extraneous or outside influence from reaching the jury in an effort to ensure impartiality and to ensure that the accused receives a fair trial. The jury's verdict must be based on the evidence before them. Outside influences must be eliminated if possible and minimized otherwise or the verdict rendered is questionable and a mistrial is appropriate. Fuselier v. State, 468 So.2d 45 (Miss. 1985).
Although defense counsel brought the alleged outside influence to the court's attention through a motion for mistrial, she offered little proof in support of this motion. No efforts were made to call and examine those jurors allegedly infected by the extraneous materials. In short, counsel failed to preserve a sufficient record from which we can discern whether a mistrial should have been granted. However, we are quick to point out that whenever there is a question concerning outside influencing of a jury, the trial judge himself ought to examine the jury carefully to ensure that the jury's deliberations are based on the evidence produced at trial and not extraneous matters.
Williamson, 512 So.2d at 881-2 (emphasis added).
In this case, there was no careful examination made by the trial judge as to what prejudice may have resulted from the statements made by Juror Lewis. Although the trial judge had Mr. Lewis in the courtroom and had an opportunity to examine him as to what improper statements he may have made, the judge did not do so, he simply excused him from the jury. Additionally, the remaining jurors were never voir dired as to what they heard and what effect, if any, the statements may have had on the jury deliberations.
Although the trial judge in this case did ask the jurors whether they thought they could disregard the statements made by Lewis, and all raised their hands in affirmative response, this procedure falls far short of the "careful examination" anticipated by *951 this Court in Williamson.[2] The trial judge admonished the jurors to disregard the remarks, without even knowing the content of the statements. The remaining four tainted jurors had no idea whether Lewis was merely excused or punished. The trial judge's actions could have influenced the members of the jury to insure they would convict the defendant since the comments made by Lewis were allegedly very anti-conviction, anti-State. It is conceivable that the jurors were influenced to decide for conviction because they thought the judge was cueing them to do so by telling them that any remarks made by Lewis were not to be considered. The fact is, one cannot know from the record made in this case the contents of the actual statements made by Lewis, or what was going on in the minds of the jurors, since the trial judge failed to follow the proper procedures.
When a verdict is attacked, some taint therein must be shown. White v. State, 142 Miss. 484, 107 So. 755 (1926). Because the trial judge did not conduct a "careful examination" of the improper statements made and of the effect that those statements may have had on the remaining jurors, there was no record made by which "taint" could be shown. The combination of comments made by the judge and Lewis tainted the panel and a mistrial should have been granted pursuant to Unif.Crim.R.Cir.Ct.Prac. 5.15 as "conduct inside or outside the courtroom resulting in substantial irreparable prejudice to the defendant's case."
In this case, with the court admonishing the jurors to disregard the remarks, whatever they were and without even knowing what they were, the jury had been tainted. In effect, it could have been influenced by the judge to make sure the defendant was convicted. Obviously, since the judge felt that the remarks were sufficient, from what the bailiff said, to remove Lewis as a juror, then, by the same token, a mistrial should have been granted. Since the trial judge accepted the allegations against Lewis as true, it should follow that the remaining four jurors in question were indeed tainted. There appears to be not only one tainted juror, but five. Since Brent is entitled to a fair and impartial jury, and since there was not a clear showing that the jury was not tainted, a mistrial should have been granted.
For the reasons stated, I would reverse and grant a new trial consistent with this opinion.
DAN M. LEE, P.J., joins this opinion.
NOTES
[1] Exhibits S-1 through S-4 are the photographs taken by Mangold which depict the burn marks and bruises on the child.
[2] Nowhere in the record does it reflect how Danny could have otherwise received the burns on his chest.
[3] Just immediately before his selection as a juror, Lewis made it emphatically clear that he intended to vote to acquit Brent. Although we do not know what he actually told his fellow jurors, there is nothing to suggest that he had changed his mind when he told the bailiff a very short time later that he had "four" with him.
[4] E.g. the fact that the defendant in an embezzlement prosecution has been convicted three previous times of embezzlement is not admissible under Rule 404(b) "in order to show that he acted in conformity therewith" in the case for which he is on trial. If he testifies however, it is admissible under Rule 609(a) to attack his credibility as a witness because the previous convictions involved dishonesty. The fact that proffered evidence might be inadmissible for one purpose does not preclude its admission when properly admissible for another purpose. U.S. v. Abel, 469 U.S. 45, 55-56, 105 S.Ct. 465, 470-71, 83 L.Ed.2d 450 (1984); U.S. v. Martinez, 962 F.2d 1161, 1164-65 (5th Cir.1992).
[5] It was also the rule in this State that in a criminal case, the accused's reputation could not be attacked as to some character trait unless he first offered evidence of his good character. Hamilton v. State, 197 So.2d 469 (Miss. 1967); Pope v. State, 242 Miss. 362, 135 So.2d 818 (1961). Under Rule 608(a), once the accused takes the witness stand, it is discretionary with the trial court whether to admit evidence as to his reputation for veracity. U.S. v. Augello, 452 F.2d 1135 (2d Cir.N.Y. 1971), cert. denied 406 U.S. 922, 92 S.Ct. 1787, 32 L.Ed.2d 122 (1975); U.S. v. Bedonie, 913 F.2d 782 (10th Cir.1990), cert. denied ___ U.S. ___, 111 S.Ct. 2895, 115 L.Ed.2d 1059 (1991). We are not directly concerned with Rule 608(a) in this case.
[6] RULE 611. Mode and Order of Interrogation and Presentation

(a) Control by the Court. The Court shall exercise reasonable control of the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment. [emphasis supplied]
(b) Scope of Cross-Examination. Cross-examination shall not be limited to the subject matter of the direct examination and matters affecting the credibility of the witness.
(c) Leading Questions. Leading questions should not be used on the direct examination of a witness except as may be necessary to develop his testimony. Ordinarily, leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by a leading question.
RULE 403. Exclusion of Relevant Evidence on Grounds of Prejudice, Confusion, or Waste of Time
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence. (Emphasis supplied)
[7] With the exception of the placement of the burden, the weighing process under Rule 403 in such circumstances is the same as that required under Rule 609(a) when evidence of prior convictions not involving dishonesty is attempted. Jordan v. State, 592 So.2d 522, 523 (Miss. 1991); McGee v. State, 569 So.2d 1191, 1195 (Miss. 1990); Signer v. State, 536 So.2d 10, 12 (Miss. 1988); Johnson v. State, 525 So.2d 809, 812 (Miss. 1988); Peterson v. State, 518 So.2d 632, 636-37 (Miss. 1987). Under Rule 403 the objecting party has the burden of persuasion, under Rule 609 the offering party has the burden of persuasion.
[8] The comment to F.R.E. 611 states: "The inquiry into specific instances of conduct of a witness allowed under Rule 608(b) is, of course, subject to this rule." U.S. v. Hairrell, 521 F.2d 1264 (6th Cir.), cert. denied 423 U.S. 1035, 96 S.Ct. 568, 46 L.Ed.2d 409 (1975); U.S. v. Bright, 630 F.2d 804, 816 (5th Cir.1980).
[1] Benson v. State, 551 So.2d 188 (Miss. 1989) (potential juror stated before entire panel on voir dire that he had read defendant was charged as habitual offender; after questioning jurors, trial court determined that each could disregard potential juror's remark and decide case on evidence); Williamson v. State, 512 So.2d 868 (Miss. 1987) (during course of trial, juror reported to bailiff that he heard rumors regarding defendant being visited by another prisoner in her cell while the two were incarcerated; held that trial judge ought to examine jury carefully to insure that jury's deliberations were based on evidence produced at trial and not extraneous matters); Witherspoon v. State, 441 So.2d 1363 (Miss. 1983) (juror was subject to improper communication outside of courtroom while walking to local bank; trial judge examined fellow juror as to what was communicated and effect that it might have had on subject juror).
[2] The State cited Robinson v. State, 253 So.2d 398 (Miss. 1971), for the proposition that the only procedure the trial judge need follow in addressing improper statements made to jurors was to: 1) ask the members of a jury if they could promise not to be influenced by any remark made outside the courtroom and ask for a show of hands by the jury as to whether they could disregard the remarks. Id. at 400. They cited Benson v. State, 551 So.2d 188 (Miss. 1989) as affirming that holding. I disagree. Robinson is certainly modified by our subsequent holdings that the trial judge should conduct a careful examination of the person who made the improper statements and the remaining jurors to assess any damage done. Further, the Benson case is distinguishable for two reasons. First, it was a pretrial matter concerning what was said by a potential juror during voir dire. Second, an examination was conducted by the court as to what was said by the potential juror, which makes it distinguishable from this case.