# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-KA-00806-COA

**EUGENE BUTLER A/K/A EUGENE MICHAEL BUTLER, JR.**                                    APPELLANT

**v.**

**STATE OF MISSISSIPPI**                                    APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 10/21/2019 |
| TRIAL JUDGE: | HON. LAWRENCE PAUL BOURGEOIS JR. |
| COURT FROM WHICH APPEALED: | HANCOCK COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: JUSTIN TAYLOR COOK |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: META S. COPELAND |
| DISTRICT ATTORNEY: | JOEL SMITH |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 03/22/2022 |
| MANDATE ISSUED: | |

## BEFORE CARLTON, P.J., WESTBROOKS AND McCARTY, JJ.

### WESTBROOKS, J., FOR THE COURT:

¶1.     Following a boating accident in Hancock County, Mississippi, a jury convicted Eugene Butler of culpable negligence manslaughter. Butler appeals, requesting that his conviction and sentence be reversed and vacated or that he receive a new trial. After a careful review of the record, we affirm the conviction and sentence.

## FACTS

¶2.     The undisputed facts follow: Two boats collided bow to bow on Bayou Caddy in Hancock County, Mississippi, on June 25, 2016. One boat was piloted by Ryan Necaise and the other by Eugene Butler. Vanessa Mauffray, a passenger in Necaise's vessel, was injured

in the accident and died as a result of her injuries.

## I.    Necaise

¶3.    Necaise and Mauffray were out for a day of checking and setting crab traps and trolling in a small boat that Necaise had borrowed from a friend. At trial, Necaise testified that the bank was eight or nine feet away on his right-hand side when the accident occurred. He had just set his last crab trap and was behind the steering wheel, maneuvering through one curve of an "S" shaped curve, when he saw a boat in the other curve. Necaise said that Butler was on the wrong side of the waterway when he came out of the curve, but this was not unusual when navigating a curve; he assumed that Butler would move back to the proper side. Necaise testified that he put his boat in neutral and waited for Butler to change course, but Butler never did—he continued straight towards Necaise. Necaise estimated that at this point the other boat was traveling at a speed of at least thirty miles per hour and said he was going six or seven miles per hour. This is in contrast to what Necaise told Mark Barraclough with the Mississippi Department of Marine Resources marine patrol, Investigator Michael Strickland, and Lieutenant Bryce Gex—that he was going three to five miles an hour when the accident occurred. The accident reconstructionists and investigators testified that when Necaise's boat was removed from the water, the throttle was three-quarters down.[1] Necaise said was not sure if the lock on the throttle worked.

¶4.    Necaise said that when he first saw Butler (rather than just the boat) the two boats were about thirty feet apart, and Butler was turned around facing the motor. According to

___

[1] A "throttle" is used to shift gears on a boat.

2

the accident reconstructionists and investigators, they were probably closer to 600 feet apart. Necaise did not disagree. When this discrepancy was pointed out, he testified that he was not good with measurements and distance. At the time, Necaise could not determine whether Butler was standing at the steering wheel or near the motor at the rear of the boat. Necaise said the area where the collision occurred was about twenty feet wide. (It was later shown to be seventy feet wide.) Necaise stated that based on the rules of the road for the Coast Guard, Butler should have been the one to move.[2] According to Necaise, Butler never turned toward the far side of the bayou. In an effort to get Butler to turn, Necaise said he stood up and yelled and waived his arms trying to get Butler's attention. At trial he testified that when he realized Butler was not paying attention he turned his boat to the right, despite the fact that he was already so close to the bank and he "was going to run my boat up on land, but I was moving so slow, I had to turn the wheel. I was so close to land but he was on top of me already." This testimony was consistent with what he told Investigator Barraclough who confirmed that "standing up and waving when another boat is headed towards you[]" is a typical evasive action. Patrick Carron, an investigator for the Mississippi Marine Resources Department, was admitted as an expert in marine safety and accident reconstruction and testified that there would have been little to no room for Necaise to move his boat further to his right in an attempt to avoid the accident, but technically Necaise had an obligation under

---

[2] No formal name of a boating safety rule book or manual appears in the record before us, nor did the parties provide one. The rules referenced by investigators at trial appear to be those set forth by the Navigation Center of United States Department of Homeland Security and the United States Coast Guard rules, which are currently available at https://www.navcen.uscg.gov/?pageName=NavRulesAmalgamated (last visited Mar. 22, 2022). However, we base our analysis on the parties' arguments and the appellate record.

3

the rules to change his course or speed. Investigator Carron testified that if Necaise had moved to the left he probably would have been hit broad side. Investigator Strickland testified that shifting into neutral would have been in compliance with any duty on Necaise's part to take evasive action.

¶5. The boats collided bow to bow, and Necaise testified that he was thrown over the center console, landing on the floor of his boat.[3] Previously, he had told Investigator Michael Strickland that he was thrown from the steering controls to the bottom of the boat, and he had told Mark Barraclough, with the Mississippi Department of Marine Resources marine patrol, that he fell backward. Necaise recalled hearing something that sounded like a motor passing over him. He testified that his boat started sinking immediately, so he got Mauffray and helped her to the bank. They were so close to the shore that he was able to step from the boat to the bank. Necaise said that Butler was already on the bank and he helped get Mauffray to land. Necaise then attempted to get Butler's boat, which was partially on the bank, into the water. Butler joined Necaise and after a few minutes they had the boat fully in the water. While this was happening, Necaise said that Butler "kept telling me he was sorry and he wasn't paying attention." Necaise got in the boat and Butler handed Mauffray to him. At trial Necaise testified that the boat would not crank and that Butler did something with the motor. This took a minute or two, and then they went to the dock. At some point, Butler told Necaise there was something wrong with the "shifter." Necaise was unsure whether the motor was off when they approached the dock, but they "glided into [it]" and "kind of hit the

_____

[3] The "bow" is the front of a boat.

4

dock a little bit." Attempts to relay information to an ambulance while on the way to the dock were unsuccessful, so upon reaching the marina, Necaise said he went inside and asked "Timmy" to call 911. He later testified that he ran to "Timmy's house" and got him to call 911.

¶6. Investigator Carron was questioned at trial about the inconsistencies Necaise made. Specifically, when asked how the throttle could have been at three-quarters when Necaise said it was in neutral at the time of the collision, Investigator Carron said that "based on the physical evidence, the defendant's vessel exited Ryan Necaise's vessel in that back starboard quadrant [where the throttle was located]. That boat, that 20-foot Hydra Sport that [Butler] was driving could have easily pushed that throttle to where it was." There was additional expert testimony that the throttle could have been moved during the salvage operation. Investigator Carron also said that he did not find it significant that Necaise gave slightly different statements about where he fell on impact. When asked why Necaise told one investigator he heard Butler's boat before he saw it and told another investigator the opposite, Investigator Carron responded only that the court would have to decide Necaise's credibility.

¶7. Marijuana and a pipe were found on Necaise's boat after the accident (although it was not determined that it belonged to him), and he admitted to having smoked marijuana several hours before the collision. That admission was confirmed by a preliminary toxicology test in which cannabinoids were found in Necaise's blood. However, a follow-up test to confirm the preliminary findings was negative. State witness Albert Phillips, a forensic scientist with

5

the Mississippi Forensics Laboratory, testified that the initial test was a "presumptive" test, not a "confirmatory" test. According to Phillips, "the screen is actually looking for the inactive metabolite in the blood as an indicator that there could be THC there or the carboxylic acid also." Phillips stated that the presumptive results are not classified as "positive;" they are simply not negative and are sent for further testing that, as in this case, showed neither inactive metabolite nor a parent compound of THC. When questioned about the absence of inactive metabolite or THC in Necaise's system when he admitted to having smoked marijuana several hours before the incident, Phillips' only explanation was that the timing of Necaise's marijuana use must have been wrong. Over Butler's argument to the contrary, the trial court granted the State's motion in limine to suppress this information.[4]

## II.     Butler

¶8.     Butler was fishing but had decided to call it a day and started for the dock about ten minutes before the collision. When he attempted to crank the boat's motor to head in, it would not start and Butler determined that the shift linkage was broken.[5] He removed the cover from the motor and was able to manually start it. Butler and Necaise were coming from opposite directions on the bayou when the accident occurred. Butler said he was passing through a blind curve (meaning they could not see around the bend) immediately

---

[4] Butler presented only a thin argument before the trial court in opposition to the State's motion in limine—citing no applicable rules or caselaw. However, given the importance of the right of an accused to present a defense, we decline to determine whether he waived his right to appeal this issue, instead we analyze the appropriateness of the trial court's grant of the motion in limine.

[5] The "shift linkage" connects the throttle to the transmission.

before the accident. Butler testified that before beginning the curve, he saw nobody in front of him (where Necaise would have been) and he could actually see all the way to the next curve. He did not believe that Necaise would have been able to see him. After starting through the curve, he briefly turned to make sure no one was behind him. When he turned to the front again, Necaise's boat was coming toward him. Unfortunately, they collided instead of passing each other on opposite sides of the waterway. Butler told investigators that the accident occurred in the straightway, although at trial he was adamant that it occurred in the canal.

¶9. It is undisputed that there is no set speed limit in the area where the accident occurred. At trial, Butler testified that he was traveling in the middle of the bayou at twenty-five to thirty miles per hour. This speed is consistent with findings from the accident reconstructionist. Butler further testified that he was standing at the center console with both hands on the steering wheel and that Necaise (also in the middle of the bayou) was moving at approximately fifteen miles per hour. This was the first time Butler had told anyone that Necaise was in the middle of the bayou. During cross-examination, Butler testified that twenty-five to thirty miles per hour was a safe speed (even in a blind curve) as long as there were no other boats around. At trial, when asked, "You didn't know if there were any boats in the area, right?" Butler responded, "No, I did not."

¶10. Butler said he only had three to five seconds to react. At trial he stated that when he turned the boat to avoid the accident, Necaise turned his boat in the same direction. Butler said he attempted to turn in the opposite direction, but the boats collided. This recollection

7

is consistent with what he told Officer Daniel Boyer after the accident. According to Butler, he did not slow down, and neither did Necaise. Butler stated that he did everything he could to avoid the accident and that he would have slowed down if he had seen Necaise earlier. Butler also stated at trial that the broken shift linkage, which did not cause any steering issues, did affect the way he changed gears. For example, to shift to neutral, he had to lower the throttle to neutral and walk back to the motor to put the boat in neutral. However, Butler said he had not moved from the center console when traveling through the curve and that Necaise would have only seen the back of his head, not his back. Butler further stated that at the rate of speed he was going, it would have been impossible for him to walk back to the motor to change gears.

¶11.    The force of the collision threw Butler against his windshield, and he testified that although he did not know exactly what happened, the boats struck bow to bow at an angle, with Butler's boat actually going over Necaise's boat. Necaise's boat began to sink immediately, and Butler's boat ended up partially on the bank. Butler used his shirt to help staunch Mauffray's bleeding and helped Necaise get her into his boat. Butler recalled telling Mauffray he was sorry, but he did not recall telling Necaise that he had not seen them. The two men dislodged the boat from the bank, but it took a couple of minutes to get the motor running. When the boat started, Butler drove them to the marina where he says he docked without incident and called 911 to report the accident.

¶12.    Immediately after the collision, Investigator Barraclough spoke with Necaise and Butler. In his report and at trial, he attributed the accident to Butler's inattention and a

8

navigational rule violation. Investigator Michael Strickland testified that Butler told him the shift linkage was broken before he set out that morning. Testimony was also provided by Investigator Carron regarding the broken shift linkage. He said this would have kept Butler from being able to slow down or come to a stop. Butler told Investigator Carron that he had tried to correct by swerving rather than stopping in order to avoid the accident. Investigator Carron testified that Butler should have had plenty of room to determine a safe course of travel, and the fact that he said he was unable to do so was "consistent with what Mr. Necaise said about the defendant being turned around or not paying attention." He also said that he was unable to pinpoint exactly at what point on Butler's path he should have been able to see Necaise. Investigator Carron further stated that "[t]he fact that [Butler] tried to correct indicates that he was doing something or he was where he shouldn't be as far as his position in the body of water." This statement was endorsed by Investigator Strickland, and Officer Boyer testified that Butler told him he was on the wrong side of the bayou. However, Investigator Carron admitted that he did not ask Butler which side of the bayou he was on "[b]ecause everything [the investigators] looked at indicate[d] that [Butler] was on the wrong side of the bayou." According to Investigator Carron, the angle of impact and ultimate landing place of the boats makes it impossible for the accident to have occurred in the middle of the bayou. Further, even if the accident occurred in the curve, rather than in the straightway, Investigator Carron said that Butler was still on the wrong side of the bayou.

¶13.   Investigator Carron testified at trial:

> And based upon everything we saw with the physical evidence, based upon all
> the statements we reviewed, it's clear to us that there was one person that

> didn't do those things necessary. The defendant wasn't on his side of the channel. His speed was unsafe. The testimony he gave about his -- he had three seconds to react, three to five seconds to react, and I've explained the length of the waterway as far as the transit time. Relatively speaking he'd have 13 and 16 seconds to see that vessel if he were being attentive, so what was he doing if he only had three to five seconds to react?
>
> So that's everything that we took into consideration, the totality of everything we looked at, and that's how we reached the conclusion of where we are today.

Investigator Carron's ultimate conclusion, to a reasonable degree of scientific certainty, was that despite having thousands of hours' experience on the water, Butler acted negligently and violated several boating rules, including: Rule 5 (maintaining a proper lookout); Rule 6 (traveling at a speed safe for conditions); Rule 8 (avoiding a collision if one is imminent); Rule 9 (staying to the right on respective sides of the waterway); and Rule 14 (keeping right to avoid a collision when two boats meet on the water). Further, Investigator Carron testified that Butler's speed and inattentiveness contributed to the other violations.

¶14. Butler testified that he was a habitual marijuana user and had last smoked marijuana two days before the accident but had not had a drink for a week. No field sobriety test was administered at the marina, and there was no testimony from anyone present at the scene that Butler appeared to be under the influence of drugs or alcohol. Butler voluntarily submitted to a breathalyzer test. Investigator Carron testified that Butler did not blow into the Intoxilyzer 8000 with sufficient force for it to register accurately (which Butler denies); although during cross-examination at trial, Investigator Carron testified that the breathalyzer's outcome read "general diagnostic fail" rather than "insufficient sample." Butler then volunteered to submit to a blood test, but Investigator Carron decided that he

10

needed a warrant, which he later obtained from Judge Tommy Carver. Investigator Carron's decision to request a warrant was based on the fact that (1) he thought Butler's eyes were glassy; (2) Butler initially denied using prescription drugs before admitting that a day or two before the accident, he had taken a Lortab that had been prescribed by his dentist; and (3) there were several beer cans (both empty and full but at room temperature) on Butler's boat.

¶15. Butler's blood test, that occurred approximately four hours after the accident, showed positive results for 11-Nor-9-carboxy-Delta9-THC at a concentration of "31 nanograms per mil." State witness Maury Phillips, a forensic scientist with the Mississippi Forensics Laboratory, testified that 11-Nor-9-carboxy-Delta9-THC is an inactive metabolite, meaning it has no pharmacological attributes and does not affect a "person's brain or his skills." In an infrequent user, Phillips said this amount would be indicative of the fact that someone has ingested marijuana fairly recently.

¶16. The blood test was positive for Delta-9-THC at a level of 3.7 nanograms per mil. Phillips testified that while it is possible for 3.7 nanograms per mil of Delta-9-THC to affect one's motor skills, decision making, and reaction time, it largely depends on the frequency with which the individual ingests marijuana. He further testified that there was no way to determine how the 3.7 nanograms per mil would have affected Butler at the time of the collision. It was also possible that it might not have impaired Butler at all. But Phillips noted that THC levels in the blood dissipate rapidly, and they would have been higher in the time leading up to the blood test. Phillips went on to say that it is "well recognized in the forensic community that a person's [Delta-9] THC concentration in the range from 1 to 5

nanograms per mil in a DUI case can be a good indication that that person had smoked marijuana in the last couple hours, provided that they are an infrequent user. Now, a frequent user, that's a different situation." Phillips also testified that the minimum level in Mississippi for an alcohol-related DUI is .08 percent blood-alcohol concentration, the generally accepted equivalent level of THC is 13.5 nanograms per mil, and Butler's sample contained 3.7 nanograms per mil.[6]

¶17. Butler's toxicology expert, Dr. Jimmy Valentine, stated that because the outcome of the Intoxilyzer 8000 read "diagnostic fail," it was not indicative of how hard Butler blew into the machine. He testified that just because marijuana is present in someone's blood does not necessarily mean it would impair their judgment or ability to function (particularly a habitual user); although it could if someone was in the euphoric stage, which occurs soon after ingesting marijuana. Dr. Valentine did not believe that Butler's actions around the time of the accident were consistent with someone who was impaired due to marijuana use. He testified that driving too fast was not normally associated with marijuana use and that it would be more common for someone under the influence of marijuana to drive slowly. Butler's attorney elicited the following testimony from Dr. Valentine at the trial:

> Q. Are Mr. Butler's actions after the incident consistent with someone who's sober?
>
> A. It's certainly consistent with somebody that's got their faculties about them, correct.
>
> Q. Would it be possible for Mr. Butler to have been in a euphoric state at the time of the incident and have sobered up that quickly from that

_____

[6] Mississippi has no established "intoxication" level pertaining to marijuana.

12

euphoric state so as to act in the manner he did?

A.      No, sir, it would not have been.

Dr. Valentine also said that Maury Phillips had failed to take into account the margin of error for the blood test and that Butler's THC level could have been as low as 2.9 nanograms per mil. (He admitted on cross-examination that it could have been higher, too.) He further contradicted Phillips's testimony that 13.2 nanograms per mil is the equivalent of .08 percent for alcohol. He did, however, agree with Phillips that the presence of 3.7 nanograms per mil of THC could mean different things depending on whether Butler was a habitual or infrequent user. While he believed Butler's test was in line with that of a frequent user, he had never spoken with Butler about his marijuana usage.

¶18.   Butler was not charged with a crime on the day of the accident, nor was he ever charged with boating under the influence; he was allowed to go home after the blood test.

## PROCEDURAL HISTORY

¶19.   A Hancock County grand jury later indicted Butler on one count of culpable negligence manslaughter for Mauffray's death, and a jury found him guilty as charged. The indictment was subsequently amended to reflect Butler's status as a habitual offender, and he was sentenced to serve twelve years in the custody of the Mississippi Department of Corrections. The trial court denied Butler's motion for a directed verdict and his post-trial motion for a new trial. Three issues are present on appeal: (1) whether the grant of the State's motion in limine regarding Necaise's drug use deprived Butler of his right to fully assert his theory of defense; (2) whether the State presented sufficient evidence to support

13

Butler's conviction for culpable negligence manslaughter; and (3) whether the verdict was against the weight of the evidence.

## STANDARD OF REVIEW

¶20.  "Determining the relevancy and admissibility of evidence is within the discretion of the trial judge, and we will reverse only in the event that discretion has been abused." *Abrams v. Marlin Firearms Co.*, 838 So. 2d 975, 979 (¶12) (Miss. 2003).

¶21.  "In reviewing a challenge to the legal sufficiency of the evidence, we consider all of the evidence in the light most favorable to the prosecution and accept all evidence supporting the verdict as true." *Dampeer v. State*, 989 So. 2d 462, 464 (¶7) (Miss. Ct. App. 2008).  We then determine, based on the evidence, whether reasonable, fair-minded jurors could have found the defendant guilty.  *Goldman v. State*, 406 So. 2d 816, 819 (Miss. 1981).

¶22.  "When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Anderson v. State*, 62 So. 3d 927, 944 (¶60) (Miss. 2011).  In doing so, we "view the evidence in the light most favorable to the verdict." *Little v. State*, 233 So. 2d 288, 289 (¶1) (Miss. 2017).

## DISCUSSION

### I.     Was the State's motion in limine properly granted?

¶23.  A small amount of marijuana was found on the boat Neciase was driving at the time of the accident.  It was never proved that the drugs belonged to Necaise.  Additionally,

14

although no exact time can be pinpointed, Necaise admitted that he had smoked marijuana several hours before the accident. The preliminary test was only presumptive and verified the possible presence of marijuana rather than the conclusive presence. The confirmatory test was negative for the presence of THC or the relevant inactive metabolite. The State filed a motion in limine to exclude "toxicology results, drugs recovered or drug activities involving Ryan Necaise" for the following reasons: (1) the information was irrelevant based on the charges (MRE 402); (2) the probative value of the information did not outweigh the prejudicial nature (MRE 403); (3) the information was not being presented to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident" (MRE 404(b)); (4) the information was not admissible "because when offering character evidence of a witness, specific instances of the conduct of a witness, other than conviction of a crime, may not be proven by extrinsic evidence (MRE 608(b)); and (5) the information was not admissible because the criminal conviction needed for impeachment purposes was lacking (MRE 609(a)). Butler did not file a formal response to the motion in limine or present testimony at the hearings on the motion to refute the State's expert in forensic toxicology, Maury Phillips, who confirmed that he performed the blood analysis in accordance with the Mississippi Forensics Laboratory Certification and standard operating procedures. He was confident to a reasonable degree of medical certainty that there was no THC or inactive metabolite in Necaise's blood sample. Ultimately, Butler did not object to the confirmatory test being allowed into evidence. Butler did, however, object to the State's request to exclude Necaise's statement because under his theory of the case, he thought the

15

jury should know Necaise admitted to smoking marijuana eight hours before the accident.

¶24. At the conclusion of the hearing, the trial judge reserved ruling on Necaise's statement and requested additional research from the parties, stating, "I understand not only you should show this individual was under the influence but you also have to show that that was a part or a contributing factor that they did something to cause the accident." Neither party furnished additional research to the trial court. The following year, after two additional hearings, the trial court granted the State's motion in limine but did not specify the rule(s) on which it based its decision. Butler argues that the trial court erred in granting the State's motion in limine because Necaise's use of marijuana was appropriate impeachment evidence and was relevant regarding his reliability as an eyewitness and potential bias as a witness. Butler also says the exclusion of this evidence prevented him from presenting his theory of the case at trial.

¶25. Rule 401 of the Mississippi Rules of Evidence defines evidence as "relevant" when "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the case." Despite the fact that marijuana was found on the boat Necaise was driving, ownership of the drug was never substantiated. Although Necaise admitted to smoking marijuana several hours before the collision, and the preliminary drug test noted the possible presence of marijuana, the conclusory drug test was indicative of the fact that no marijuana was in his system at the time of the collision. Simply stated, because there was no proof that Necaise was either in possession of, or under the influence of, marijuana at the time of the accident, any evidence

16

or testimony relating to toxicology results, drugs recovered, or drug activities involving Necaise would be irrelevant and would not assist the jury in determining the outcome of the case. As this evidence is not relevant under Rule 401, it is not admissible under Rule 402.

¶26. Butler maintains that the State improperly argued Rule 404(b) precluded the character evidence pertaining to Necaise because the rule applies only to criminal defendants, not witnesses. We agree that courts in Mississippi have not clearly specified in what instances Rule 404(b) applies. But, the comment to Rule 404 states, "The admissibility standards of Rule 404(b) remain fully applicable to both civil and criminal cases." However, we find it unnecessary to make an unequivocal ruling today based on the fact that the evidence and testimony that is the subject of the motion in limine is irrelevant under Rule 401(as discussed above) and barred under Rule 608(b) (as discussed below).

¶27. The State relies on Rule 608(b), which states in part:

> Specific instances of the conduct of a witness . . . if probative of truthfulness or untruthfulness, [may] be inquired into on cross-examination of the witness (1) concerning his character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

We find *Brent v. State*, 632 So. 2d 936 (Miss. 1994), instructive. In *Brent*, the Mississippi Supreme Court held that under Rule 608(b) "the proffered conduct must be such as to reflect upon the witness's character for truthfulness." *Id.* at 944. "If the past conduct did not involve lying, deceit, or dishonesty in some manner, it cannot be inquired into on cross-examination." *Id.* In *Johnston v. State*, 618 So. 2d 90, 94 (Miss. 1993), the Supreme Court addressed drug use in the context of truthfulness, stating, "Neither robbery nor

17

marijuana use, the activities about which Johnston sought to elicit testimony, are probative

of [the witness's] character for truthfulness or untruthfulness." Based on the fact that the

conclusory drug test was negative for the presence of marijuana, we also fail to see how

Butler could show that Necaise's alleged marijuana use impacted his "memory and powers

of observation." *Cf. Havard v. State*, 800 So. 2d 1193, 1199 (¶20) (Miss. Ct. App. 2001).

Rule 608 does not provide Butler any relief in this instance.

¶28. Lastly, we recognize that a defendant should be allowed to present his defense, but

limitations exist. *Scott v. State*, 231 So. 3d 1024, 1031 (¶12) (Miss. Ct. App. 2016). And "all

evidence admitted in support of the defendant's theory of the case must comport with the

Mississippi Rules of Evidence." *Id.* (quoting *Clark v. State*, 40 So. 3d 531, 542 (¶30) (Miss.

2010)). As discussed at length in the following section, Butler was given the opportunity to

fully develop his theory of the case during trial. In this instance, any evidence of Necaise's

prior drug use was irrelevant to Butler's theory that the collision was a tragic accident rather

than the result of any negligence on his part. The trial court's grant of the State's motion in

limine was not an abuse of discretion and we affirm the ruling.

> II. **Did the State present sufficient evidence of culpable negligence manslaughter?**

¶29. Mississippi Code section 97-3-47 (Rev. 2014) states that "every . . . killing of a human

being, by the act, procurement, or culpable negligence of another, and without authority of

law, not provided for in this title, shall be manslaughter." Involuntary manslaughter resulting

from culpable negligence has also been "defined as negligence of a degree so gross as to be

tantamount to a wanton disregard of, or utter indifference to, the safety of human life . . . ."

18

*Phillips v. State*, 379 So. 2d 318, 320 (Miss. 1980). Culpable negligence has been found where a defendant exhibits "an indifference to the consequences of an act under the surrounding circumstances as to render such conduct tantamount to willfulness." *Evans v. State*, 562 So. 2d 91, 95 (Miss. 1990). To prove its case, the State must, in part, prove culpable negligence beyond a reasonable doubt. *Id.*

¶30. Butler argues that no evidence proved that he was intoxicated (from marijuana or alcohol). Butler's argument does not afford him the relief he seeks in this instance. Intoxication is not a required element of culpable negligence manslaughter. As stated by the trial court in the hearing on Butler's motion for a new trial, "[h]e was not charged with causing the accident [while] being under the influence. He was charged with manslaughter. Negligence." Although intoxication or the presence of alcohol or drugs does not meet the standard of culpable negligence per se, it is a factor to be considered. *Evans*, 562 So. 2d at 96; *Whitehurst v. State*, 540 So. 2d 1319, 1323 (Miss. 1989) ("The jury was properly instructed that alcohol consumption in and of itself does not constitute culpable negligence, but taken in conjunction with all other factors, it can."). In *Cutshall v. State*, 191 Miss. 764, 4 So. 2d 289, 291-92 (1941), which Butler relies on, the Supreme Court stated that just because a defendant was under the influence of alcohol, which resulted in the death of another, he is not automatically guilty of culpable negligence. For alcohol to be a factor in a finding of culpable negligence, the State must show that the alcohol created "an abnormal mental and physical condition which tends to deprive one of clearness of intellect and control of oneself which he would otherwise possesses." *Frazier v. State*, 289 So. 2d 690, 692

(Miss. 1974). We do not know whether the jury gave any weight to the fact that Butler had THC in his system at the time of the accident.

¶31. Under the influence or not, other factors were present upon which a jury could find Butler guilty of culpable negligence manslaughter. Officer Carron told the jury that Butler violated five boating rules in the time leading up to the collision: Rule 5 (maintaining a proper lookout); Rule 6 (traveling at a speed safe for conditions); Rule 8 (avoiding a collision if one is imminent); Rule 9 (staying to the right on respective sides of the waterway); and Rule 14 (keeping right to avoid a collision when two boats meet on the water). Other investigators corroborated Office Carron's testimony and Butler did not attempt to refute the fact that he was going too fast for the existing conditions—he said only that he did not know another boat was present. Although disputed by Butler, there was testimony that he did not make any effort to avoid the accident. *See Atkinson v. State*, 392 So. 2d 205, 207 (Miss. 1980) ("[T]he defendant's failure to make any attempt to go back into his proper North-bound lane or take some other steps in order to avoid the tragic collision was sufficient to sustain the conviction for culpable negligence."). The jury also heard testimony about the broken shift linkage. Butler challenged the evidence against him, called Necaise a liar, and pointed out inconsistencies in the witnesses' testimony for the jury to consider. Although the collision was not intentional, the jury apparently found Butler's actions under the circumstances (including speeding and not paying attention) were grossly negligent and were undertaken with an utter indifference to human life.

¶32. In reviewing the legal sufficiency of the evidence, our authority to disturb the jury's

verdict is quite limited. *Clayton v. State*, 652 So. 2d 720, 724 (Miss. 1995). This Court has held that "[t]he jury is charged with the responsibility of weighing and considering conflicting evidence, evaluating the credibility of witnesses, and determining whose testimony should be believed. The jury has the duty to determine the impeachment value of inconsistencies or contradictions as well as testimonial defects of perception, memory, and sincerity." *Ford v. State*, 737 So. 2d 424, 425 (¶8) (Miss. Ct. App. 1999) (citation omitted). In reviewing the evidence in the light most favorable to the prosecution, we find that a rational trier of fact could have found Butler guilty of culpable negligence manslaughter beyond a reasonable doubt. Sufficient evidence existed to support the jury's conviction of Butler, thus this issue is without merit.

### III. Was the jury's verdict against the weight of the evidence?

¶33. After the trial, Butler filed a motion for judgment notwithstanding the verdict or a new trial stating that the verdict was against the weight of the evidence. At the close of arguments on Butler's motion, the trial court denied the post-trial motion: "[T]his Court is not going to invade the purview of the jury. They are the sole jurors of the weight and credibility." Despite making an argument only as to the sufficiency of the evidence in his appeal, Butler requested a new trial, which is the appropriate remedy where a jury verdict is against the weight of the evidence. Because Butler failed to address the weight of the evidence in his briefs, Rule 28(a)(7) of the Mississippi Rules of Appellate Procedure bars this claim. *See Satterfield v. State*, 158 So. 3d 380, 383 (¶6) (Miss. Ct. App. 2015) ("An appellant cannot give cursory treatment to an issue and expect [this Court] to uncover a basis for the claims,

21

either in the record or in the law; simply put . . . the appellant must affirmatively demonstrate error in the court below, and failure to do so waives an issue on appeal.").

¶34. Notwithstanding the procedural bar, out of an abundance of caution we have reviewed the record to determine whether Butler is entitled to a new trial. "While the motion for a directed verdict presents to the trial court a pure question of law, the motion for a new trial is addressed to that court's sound discretion. . . . [A] defendant seeking a new trial is inherently not interested in a final discharge." *Fleming v. State*, 732 So. 2d 172, 183 (¶37) (Miss. 1999). "A new trial based on the weight of the evidence should be granted 'only in exceptional cases in which the evidence preponderates heavily against the verdict.'" *Clark v. State*, 237 So. 3d 844, 847 (¶13) (Miss. Ct. App. 2017) (citation omitted). In this instance, our review of the evidence leaves us unpersuaded that the State's case was so weak or the defendant's proof was so persuasive that the jury's decision to convict amounts to a manifest injustice. The trial court's decision to deny Butler's motion for a new trial was not an abuse of discretion, and we do not reverse it.

## CONCLUSION

¶35. Based on the foregoing, we find that the trial court did not abuse its discretion in granting the State's motion in limine. Additionally, the State presented sufficient evidence that Butler's actions on the day of the boating accident constituted culpable negligence manslaughter and that reasonable jurors could have found Butler guilty based on the evidence presented at trial. Furthermore, the jury's verdict was not contrary to the overwhelming weight of the evidence, and no new trial is warranted. Finding no error, we affirm.

22

¶36. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE AND McDONALD, JJ., CONCUR. LAWRENCE, J., SPECIALLY CONCURS WITH SEPARATE WRITTEN OPINION, JOINED BY GREENLEE, McDONALD AND McCARTY, JJ. WILSON, P.J., AND McCARTY, J., CONCUR IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. EMFINGER, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. SMITH, J., NOT PARTICIPATING.**

**LAWRENCE, J., SPECIALLY CONCURRING:**

¶37. I concur with the majority in affirming the jury's factual determinations. However, I write to express my concerns about an issue that could arise in culpable negligence manslaughter cases. If the victim's actions are the sole proximate cause of his or her own death, the defendant is not guilty under our law. In those rare circumstances where a legitimate issue of whose actions proximately caused the death of the victim exists, it is important not to preclude relevant evidence, which would assist a jury in reaching a just result.

¶38. In *Dickerson v. State*, 441 So. 2d 536 (Miss. 1983), the Mississippi Supreme Court clearly recognized that proximate cause could be an issue in culpable negligence manslaughter cases when it questioned whether "the State [had] proved that [Dickerson] was guilty of culpable negligence **which proximately caused** Russell's death." *Id.* at 538 (emphasis added). The court noted that "[i]n order for the influence of intoxicating liquors to be a factor in showing criminally culpable negligence, **it must contribute proximately both to the establishment of such negligence and to the resultant death**." *Id.* (emphasis added) (quoting *Cutshall v. State*, 191 Miss. 764, 4 So. 2d 289, 292 (1941)). Thus, if the victim's actions were the proximate cause of the victim's own death, then the defendant's

23

actions never completed the crime. *See id.*

¶39. Further, in *Frazier v. State*, 289 So. 2d 690 (Miss. 1974), the supreme court indicated that a defendant cannot be guilty of culpable negligence manslaughter if his or her actions are not the proximate cause of the victim's death. *Id.* at 692. Frazier appealed her conviction of culpable negligence manslaughter. *Id.* at 691. Frazier and another individual, Sam, were drinking one afternoon. *Id.* Sam was "heavily intoxicated," but Frazier "was not intoxicated." *Id.* Sam offered to drive Frazier, but Frazier refused unless Sam let her drive. *Id.* Sam agreed and let Frazier drive while Sam rode in the passenger seat. *Id.* While Frazier was driving, Sam touched the gear shift "and then decided he wanted to drive." *Id.* Sam grabbed the steering wheel of the vehicle and jerked it, causing the car to veer right and almost run off the road. *Id.* Frazier fought Sam off in an attempt to regain control of the vehicle, but in doing so, she caused the car to turn left and lost control. *Id.* The vehicle Frazier was driving went into the left lane of traffic and collided with another car, killing its driver, Edith McMillan, and two passengers. *Id.* There was no proof presented at trial to show that the "defendant was speeding or that she was driving recklessly prior to the time Sam tried to take control of the car." *Id.* Frazier was ultimately convicted of culpable negligence manslaughter, and she appealed. *Id.*

¶40. On appeal, the Mississippi Supreme Court had to determine "whether the proof was sufficient to establish beyond a reasonable doubt that [the] [victims] died as a proximate result of defendant's culpable negligence[.]" *Id.* The Court determined that Frazier's drinking was not the proximate cause of the victim's death. *Id.* The Court stated, "**In other**

24

**words there is a total lack of proof that her drinking was the proximate cause of the death of Mrs. McMillan**." *Id*. (emphasis added). The Court explained Frazier offered to drive because Sam was too intoxicated to drive. *Id*. Sam began touching the gear shift while Frazier drove. *Id*. The evidence showed that Sam's "irrational act of grabbing the steering wheel was the immediate and efficient cause of defendant losing control of the car." *Id*.

¶41.    Here, it is important to note that Butler never raised at trial or on appeal any acts of Necaise's that would amount to a proximate-cause issue. Instead, Butler argued that the evidence showing Necaise smoked marijuana several hours prior to driving his boat was admissible for purposes of attacking Necaise's reliability in recounting the accident and to show possible bias to cover his own actions. However, it is easily conceivable that in future cases, a victim's actions could be the proximate cause of his or her own death, thereby precluding a defendant from being criminally liable. In such a case, a jury should be presented with evidence relating to the proximate-cause issue in an effort to determine the truth and render a verdict according to the law and the facts presented.

   **GREENLEE, McDONALD AND McCARTY, JJ., JOIN THIS OPINION.**

25