# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-00082-COA

**DAVID EARL BROWN, JR. A/K/A DAVID E. BROWN, JR.**  APPELLANT

**v.**

**STATE OF MISSISSIPPI**  APPELLEE

DATE OF JUDGMENT: 11/18/2022
TRIAL JUDGE: HON. CHRISTOPHER LOUIS SCHMIDT
COURT FROM WHICH APPEALED: HARRISON COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT
ATTORNEYS FOR APPELLANT: LANCE O'NEAL MIXON
THOMAS BOYD SHAW
ATTORNEY FOR APPELLEE: OFFICE OF THE ATTORNEY GENERAL BY: BARBARA WAKELAND BYRD
NATURE OF THE CASE: CRIMINAL - FELONY
DISPOSITION: AFFIRMED - 07/23/2024
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., McCARTY AND EMFINGER, JJ.**

**McCARTY, J., FOR THE COURT:**

¶1. A man was accused of sexually abusing his stepdaughter. Age fourteen at the time law enforcement was contacted, the girl alleged he had been abusing her for over the past year. The man was indicted on multiple counts and found guilty. On appeal, he claims he should have been allowed to present testimony about the victim's character, that the date ranges contained in the indictment were insufficient, and that the evidence in total was insufficient to support the convictions. Finding no error, we affirm.

## FACTS

¶2.     In the early morning hours of September 11, 2020, fourteen-year-old Dana[1] "woke up to cops" at her house. Just hours before, on September 10, Dana confided in her boyfriend via text message "that something happened about a year or 2 ago and keeps happening[.]"

¶3.     After much back and forth between Dana and her boyfriend, it was revealed that Dana's thirty-year-old stepfather, David Brown, had been sexually abusing her. Over her persistent objections, Dana's boyfriend called the Gulfport Police Department to report the abuse.

¶4.     Dana would later testify that shortly after the police arrived at her house, she told them about the abuse "[b]ecause I was tired of it happening, and I wanted it to stop." Afterward, her mother took her to the hospital "so they could do a rape kit." Brown was later indicted on three counts of touching a child for lustful purposes and four counts of sexual battery.

**PROCEDURAL HISTORY**

¶5.     Prior to the start of trial, the State and the defense each made pretrial motions. The State's motion focused on precluding witnesses "from opining as to the victim's truthfulness." Stating that it was "not seeking to call any witnesses that would testify as to the general truthfulness[of the victim,]" the defense clarified it would only offer a witness to "speak to [a] specific instance." Noting "[o]pinion testimony for truthfulness or reputation for truthfulness is permissible if it's followed according to the rules," the trial court granted the State's motion.

---

[1] We use a pseudonym to protect the identity of the minor child.

¶6. Through counsel, Brown made a motion to quash his indictment, specifically addressing "Count III and Count VII of the indictment," arguing they lacked specificity since "two definite dates" were provided in discovery. Counsel for Brown further objected to the remaining counts, arguing that "[i]t prejudices the defendant" because "those time frames are a little outrageous and very long and . . . it's very difficult to create an alibi defense."

¶7. Citing caselaw, the State countered that "a specific date is not required so long as the defendant is fully and fairly advised of the charge against him." Further, the State argued that not only can the defendant "testify to his whereabouts" since "he would have that information," but the defense also had ample time "to determine what alibi witnesses were available" yet "they haven't properly noticed any[.]"

¶8. Finding that both Counts III and VII "comply with the rules and existing case law," the trial court denied the motion.

¶9. At trial, the State called three witnesses: the victim, the nurse who performed the sexual assault examination, and the lead detective. Dana testified first. She told the jury that she was "very young" when Brown came into her life and that she called him "Dad." When asked how she would describe her relationship with Brown while she was a little girl, she responded, "Good . . . we really just did everything together." But Dana disclosed that all changed when "[h]e started making me have sex with him" beginning "at the end of seventh grade."

¶10. Dana recounted the first instance of abuse to the jury, which occurred when she was

thirteen.  She explained how one night after her phone was taken away and her "mom was in the shower," Brown "asked me if I wanted my phone back."  Being a teenager, Dana of course "told him yes, and then he started rubbing on my vagina."  Dana testified that when she told Brown "no," he replied, "Well, I guess you just won't get your phone back," and continued touching her.  Only when "[t]he shower water turned off" did Brown stop.

¶11.    Dana disclosed the next instance of abuse occurred about "a week later . . . [i]n my bedroom."  She explained that while she was "laying in bed," Brown came in and said that "he was going to come watch TV in my room."  Dana testified that Brown got into her bed and began touching her vagina both over and under her clothes.  When asked if Brown's fingers remained on the outside of her body and stayed still, Dana told the jury his fingers went inside her vagina and moved "in and out."

¶12.    Recounting the frequency of Brown's sexual abuse, Dana testified that it happened "a lot . . . probably about every other night" until the beginning of her ninth-grade year.  And "[a] week or two after the second encounter" with Brown's hand, Dana testified that she was forced to "have sex with him."  She disclosed that she was "pretty sure" Brown used a condom each time.

¶13.    Dana also described extremely specific instances where her stepfather sexually abused her.  She told the jury:

> One night he told me to tell Mom that we were going to McDonald's to get Frappes, and then he ended up making me put his penis in my mouth when he was driving and then pulled over at Sam's, and then when we got back home, he just told Mom that all the McDonald's were closed or the ice cream

4

machines were broke. When asked how often Brown made Dana put his penis in her mouth, Dana responded, "[A] good bit."

¶14. On another occasion, Brown forced Dana to "come get in the shower with him" over her objections. She disclosed that she "had to go get in there" because if she did not, Brown was "going to do something else." Dana testified Brown then "made me have sex with him in the shower."

¶15. Dana told the jury that Brown had a tendency to get her in trouble with her mother if she "didn't do something" that he wanted her to do. And she never told her mother about the abuse because she was "scared" and felt like her mother "always believed [Brown] over me." Dana testified that she did not return to her home that night. Instead, she stayed at her step-grandmother (Brown's mother) Karen Brown's house for about a month.

¶16. The State called Brandee Toothman next, a registered nurse experienced in treating victims of sexual assault. Toothman was accepted as an expert in the field of nursing by the trial court. Toothman testified that "sometime after midnight" on September 11, 2020, Dana arrived at the hospital for treatment. When asked the reason for Dana's visit, Toothman disclosed that Dana "stated that she was sexually assaulted by her stepfather," whom she was able to identify as David Brown.

¶17. Toothman testified that although Dana specified two dates on which the abuse occurred—the most recent being September 10, 2020—she clarified that Dana disclosed the

abuse "happened more than these two occasions." After being asked to describe the most recent instance of sexual abuse, Toothman testified that Dana disclosed Brown had "digitally penetrated" her vagina, and "she was forced to have oral sex." Dana disclosed that this instance took place in her bedroom.

¶18. The other, less recent specified instance of sexual abuse occurred on September 7, 2020. Dana disclosed to Toothman that Brown penetrated her vagina with his fingers and penis and performed oral sex on her in her parents' bedroom. Toothman told the jury that Dana disclosed that Brown "told her that she needed to shower after he was finished."

¶19. When asked if showering or any other hygienic activity would affect her ability to treat a victim or collect evidence, Toothman responded, "Washing, showering, [or] changing clothes would wash away quite a bit of evidence or potential evidence." She agreed that the use of a condom would also impact the ability to collect DNA evidence from victims of sexual assault.

¶20. Although Dana's sexual assault examination did not reveal any immediate signs of sexual abuse, injury, or trauma, Toothman testified that a lack of these visual findings was not surprising because "when it comes to trauma . . . that area tends to heal fairly quickly." She added that in sexual assault cases where condoms are used, she would expect to find "minimal" DNA evidence and "very little" evidence in cases reported over 72 hours from the abuse.

¶21. The jury also heard from Mitchell Ashby, a detective with the Gulfport Police

6

Department and the lead detective over Brown's investigation. Detective Ashby testified that the police department "received a report of a sexual assault of a minor" at 12:32 a.m. on September 11, 2020. He testified that officers responded to the house of Dana's fifteen-year-old boyfriend and learned Dana had disclosed Brown was sexually abusing her. Officers then responded to Dana's home, where she lived with her mother and Brown. Detective Ashby testified that he arrived on the scene around 1:45 a.m. and spoke with Dana's mother, who agreed to cooperate with the investigation.

¶22. In describing Dana's demeanor at the time, Detective Ashby recounted that "she was incredibly shaken up" and "had been crying." He further stated that he did not conduct an initial interview with Dana, as "that is preserved for what is known as a forensic interview." The detective explained to the jury that this type of interview is "conducted by someone who is trained to interview children who have suffered from sexual abuse. They are trained to ask non-leading or non-suggestive questions." Detective Ashby testified that Daniel Dooley of Children's Canopy Solutions conducted Dana's forensic interview on September 28, 2020. In the interview, Dana identified the types of abuse she experienced at the hands of her stepfather. The State rested its case-in-chief.

¶23. Subsequently, the defense moved for a directed verdict, which the trial court denied. Brown then testified in his own defense. Acknowledging that he "would imagine" there were times he was alone with Dana, Brown could not pinpoint an exact date he actually was alone with her. Instead, he claimed he was alone with Dana "very little." When asked

whether he touched or molested Dana in any way on September 7 or September 10, Brown said no. Brown testified that Dana was just "a mad teenage girl," indicating that she made up the allegations against him.

¶24. The defense then sought to call Karen Brown, the defendant's mother (and victim's step-grandmother), and made an offer of proof outside the presence of the jury.

> Defense: And in caring for [Dana], did Detective Ashby come to the house?
>
> K. Brown: Yes, he did.
>
> Defense: Did you overhear any conversations between Detective Ashby and her?
>
> K. Brown: I heard one as I was going through the house.
>
> Defense: Can you recall that conversation?
>
> K. Brown: From what I heard when I come through the house was that he was telling her that if she was caught lying, that she could go to jail, and then after he left she asked me.
>
> Defense: What did she ask you after he left?
>
> K. Brown: If she – what kind of jail she would go to or if she would go to foster care.
>
> Defense: That's all, Your Honor.

In advocating for the admissibility of this proffered testimony, the defense argued it did not fall within Mississippi Rule of Evidence 608, was not hearsay, and was relevant.

¶25. In response, the State asserted it was inadmissible hearsay because it was being offered for the truth of the matter asserted—that Dana actually asked the particular question.

8

Further, the State argued that this was an improper impeachment by the defense:

> What the defense is attempting to do is impeach the credibility of [Dana] through a – through extrinsic evidence being the testimony of Ms. Brown when they failed to ask the question to [Dana] as to whether or not she had this conversation with Detective Ashby, made this statement to Ms. Brown, and give her the opportunity to either admit or deny that she did.

> Further, they failed to ask Mr. – Detective Ashby whether or not he had this conversation with [Dana] and admit or deny whether they did. So they are attempting to now offer this as impeachment to her credibility when they didn't give those witnesses the opportunity to admit or deny.

¶26.    The trial court then ruled that Karen Brown's testimony "would be shown or offered to prove the truth of the matter asserted" and was therefore inadmissible hearsay. The trial court found "no admission by [Dana] that she lied" but, instead, a statement that was "simply inferential, at the b[are] minimum[.]" Additionally, the trial court ruled that the testimony "should be excluded" because "its probative value would be substantially outweighed by the danger of unfair prejudice inasmuch as the witness has not been confronted with it, nor has the detective, as well as confusing the issues before the jury."

¶27.    Lastly, Brown's sister Kaydi Parm testified for the defense. Her testimony essentially attempted to provide Brown with an alibi on September 10. However, during cross-examination, Parm admitted that during the two-plus-years investigatory period, she never went to law enforcement with that information because "she wasn't aware that [she] should." She further testified that she only spoke to Brown's attorneys after she was "approached about it by my brother," which occurred "about a month" before trial.

¶28.    The jury found Brown guilty of all seven counts: three counts of touching a child for

lustful purposes and four counts of sexual battery. He was sentenced to 45 years in the custody of the Mississippi Department of Corrections, with 10 of those years suspended and 35 years to serve, followed by 5 years of reporting for post-relief supervision. The trial court denied his motion for judgment notwithstanding the verdict or a new trial. Brown then appealed.

## DISCUSSION

### I. The trial court acted within its discretion by excluding Karen Brown's proffered testimony.

¶29. On appeal, Brown argues that the trial court abused its discretion by excluding the proffered testimony of his mother, Karen Brown, who was the victim's step-grandmother. Specifically, he argues that his mother's testimony should have been allowed into evidence—not to attack Dana's character for truthfulness but to show a specific instance of conduct that occurred between her and the detective—that Dana had asked the defendant's mother what kind of jail or foster care she would go to if she were caught lying.

¶30. "[E]vidence of truthful character is admissible *only after* the witness's character for truthfulness has been attacked." MRE 608(a) (emphasis added). So there is an express predicate before admission of this type of evidence—it can occur "only after the witness's character for veracity has been attacked." MRE 608 adv. comm. note.

¶31. There is a further constraint on the usage of specific instances of conduct. MRE 608(b). "Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the

witness's character for truthfulness." MRE 608(b). The Advisory Committee Note to Rule 608 terms this an "absolute prohibition on extrinsic evidence" but makes clear it "applies only when the sole reason for proffering that evidence is to attack or support the witness's character for truthfulness." Crucially, "[t]he extrinsic evidence prohibition of Rule 608(b) bars the use of any kind of evidence, including documents or *the testimony of other witnesses*, except a direct admission by the witness being cross-examined." MRE 608 adv. comm. note (emphasis added).

¶32. Evidence on this point may not be introduced simply at the whim of a party. Our Supreme Court has established that "[p]rocedurally, before counsel attempts an inquiry on cross-examination as to specific acts of past conduct not resulting in a conviction[,] he should inform the trial judge that he intends to do so," at which point the trial court can "conduct a hearing outside the presence of the jury." *Brent v. State*, 632 So. 2d 936, 945 (Miss. 1994). The rule "does not authorize a fishing license, but counsel must have specific instances of past conduct about which he proposes to cross-examine the witness, and inform the trial judge of them." *Id*. At that point, "the trial judge can determine first if the conduct reflects upon the witness's honesty," a required predicate before admission, and then perform a balancing test "under Rule 403 and also determine whether admission of the evidence will advance the ascertainment of the truth in the case." *Id*.

¶33. While Brown now complains he was restrained from presenting his mother's testimony, it is clear from our review of the transcript that none of the predicates of Rule 608

or precedent were met. First of all, Brown never placed Dana's character for truthfulness into question. The point of Karen Brown's testimony was to hint that Dana's allegations of abuse by her stepfather lacked credibility. But neither Dana nor Detective Ashby were asked essential foundational questions regarding whether the victim had expressed fear of incarceration if her story were not believed by law enforcement.

¶34.    As the State phrased it in the trial court below, "they failed to ask the question to [Dana] as to whether or not she had this conversation with Detective Ashby, made this statement to Ms. Brown, and give her the opportunity to either admit or deny that she did." Without this key predicate being laid, it was not an abuse of discretion for the trial court to refuse to allow the defense to present Brown's mother's testimony to the jury.

¶35.    It must be said that the defense fully preserved this issue for our review through means of a proffer. *See* MRE 103(d). However, the defense did not follow the clear requirements of Rule 608 and *Brent* to first lay the predicate regarding the issue of the witness's veracity. While *Brent* warns lawyers that they must first inform the trial court of what they are seeking during questioning in order to safeguard against the usage of cross-examination as a "fishing license," here, there was no attempt at all to attack the veracity of either Dana or the detective. Lacking this crucial ingredient, the witness's testimony was properly excluded.

¶36.    Furthermore, the full context of Dana's statement reveals it was not solely focused on her capacity for truthfulness, as required by the Rule. Brown hones in on a fragment of what Dana allegedly told Brown's mother—that the teenage girl asked "what kind of jail she

12

would go to or if she would go to foster care," insinuating that the victim knew her story might lack credibility. But that question was only asked as a followup to a scrap of conversation that Brown's mother overheard Detective Ashby say to Dana: "From what I heard when I come through the house was that he was telling her that if she was caught lying that she could go to jail[.]" In stressing the seriousness of the allegations to Dana, it was the detective who planted the concern that if she were found to not be telling the truth, then she might "go to jail"—a fear the fourteen-year-old girl wanted to discuss with a person she trusted.

¶37. Our Supreme Court has held that "[a]s long as the trial court remains within the boundaries of the Mississippi Rules of Evidence, its decision to admit or exclude evidence will be accorded a high degree of deference." *Hickman v. State*, 73 So. 3d 1156, 1160 (¶14) (Miss. 2011) (reviewing MRE 608).[2] Given the lack of questioning of either Dana or the detective about her character for truthfulness, we find no abuse of discretion in the trial court's exclusion of the testimony of the witness.

## II. The indictment is legally sufficient.

¶38. Brown next argues that the trial court should have quashed the indictment because it was "woefully insufficient as to [C]ounts 1, 2, 4, and 5." Specifically, he contends that the indictment did not inform him with "sufficient specificity of the dates of the allegations to

---

[2] In considering whether to exclude this witness, we note that the trial court also analyzed this issue under Rule 801(c) and Rule 403. However, because we find the issue to be dispositive under Rule 608, that is the basis on which we affirm.

allow him to adequately prepare his defense."

¶39.  "The question of whether an indictment is fatally defective is an issue of law, and, therefore, is reviewed de novo by this Court."  *Gilmer v. State*, 955 So. 2d 829, 836 (¶24) (Miss. 2007).  "The purpose of an indictment is to furnish the defendant with notice and a reasonable description of the charges against him so that he may prepare his defense."  *Goff v. State*, 14 So. 3d 625, 665 (¶175) (Miss. 2009).

¶40.  Notably, "a specific date in a child sexual abuse case is not required so long as the defendant is fully and fairly advised of the charge against him."  *Jenkins v. State*, 131 So. 3d 544, 549 (¶14) (Miss. 2013) (internal quotation mark omitted); *see also Morris v. State*, 595 So. 2d 840, 842 (Miss. 1991) (finding the young "victim's testimony amply illustrate[d] the fact that the State could not narrow the time frame any more than it did[,]" and "[d]efendant was fully and fairly advised of the charge against him").

¶41.  For each relevant count, Brown's indictment alleged that the abuse occurred within a specific time period: Count I (on or between January 1, 2019, and August 31, 2019); Counts II, IV, and V (on or between September 1, 2019, and August 31, 2020).

¶42.  Dana testified that she was only thirteen years old and "at the end of seventh grade" when her stepfather began sexually abusing her.  And she was forced to endure that abuse up until the beginning of her ninth-grade year "a lot . . . probably about every other night."  The frequency with which the sexual abuse occurred over the course of this two-year span corroborates that "the State could not narrow the time frame [in the indictment] any more

14

than it did." *Morris*, 595 So. 2d at 842.

¶43.    Moreover, Counts I, II, IV, and V of the indictment fully notified Brown of the charges against him.  Brown complains that "had the State alleged specific dates in the indictment, [he] could have reasonably prepared alibi defenses for the specific dates alleged." However, the defense had ample time to "determine what alibi witnesses were available" to Brown but failed to properly notice any before trial.  And Brown's ultimate defense at trial was not only that he never sexually abused Dana, but also that he could not have done so because he was alone with her "very little."  More specific dates in the indictment would not have bolstered Brown's complete denial of all the allegations.

¶44.    We find Brown was apprised of the charges against him and suffered no prejudice in preparing an adequate defense.  Therefore, we find the indictment is legally sufficient.

### III.    There was sufficient evidence to support Brown's convictions.

¶45.    Brown also contends there was insufficient evidence to support his conviction as to Counts I, II, VI, and V.  Specifically, he argues that "no rational trier of fact should have accepted as reasonable, any inferences that the proof—through the testimony of the accusing witness, Dana—was legally sufficient to establish that any of the time frames in these specific counts fit within periods when she was at the end of 7th grade, and during any time when she was in 8th grade."

¶46.    "This Court reviews a sufficiency-of-the-evidence challenge de novo." *Holder v. State*, 348 So. 3d 370, 373 (¶7) (Miss. Ct. App. 2022).  "The relevant question is whether,

after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Murrell v. State*, 955 So. 2d 975, 978 (¶11) (Miss. Ct. App. 2007).

¶47. At trial, Dana testified that her stepfather sexually abused her "probably about every other night" for almost two years. She disclosed the abuse began at the end of her seventh-grade year and continued until the beginning of her ninth-grade year. In addition to disclosing the general abuse she suffered, Dana also told the jury of two specific instances in which Brown forced her to engage in sexual conduct with him. The first instance was in the Sam's parking lot, where Dana testified Brown "mad[e] me put his penis in my mouth." The second was in the family shower, where Brown forced Dana to "have sex with him in the shower."

¶48. It is well established that jurors "may believe or disbelieve, accept or reject the utterances of any witness." *Ducksworth v. State*, 767 So. 2d 296, 299 (¶6) (Miss. Ct. App. 2000). The jurors in this case were free to "believe or disbelieve, accept or reject" any and all of Dana's testimony as well as Brown's.

¶49. "Viewing the evidence in the light most favorable to the prosecution," we find that a rational trier of fact could have found the essential elements of the crimes beyond a reasonable doubt. Therefore, we find the evidence sufficient to support Brown's convictions.

### IV. There is no plain error.

¶50. Lastly, Brown invites this Court to review the record and "employ the plain error

16

doctrine." "An appellate court may exercise its discretion to review an issue for plain error 'only where the error is clear or obvious and affects the party's substantial rights.'" *Anderson v. State*, 293 So. 3d 279, 291 (¶34) (Miss. Ct. App. 2019) (quoting *Faulkner v. State*, 109 So. 3d 142, 147 (¶15) (Miss. Ct. App. 2013)). We find no clear or obvious error that affects Brown's substantial rights.

## CONCLUSION

¶51. None of Brown's four assignments of error warrant reversal. The proffered testimony of the defendant's mother was properly excluded, as Brown did not lay a predicate for the introduction of the testimony by impeaching either the victim or the detective. Extensive precedent from the Mississippi Supreme Court and this Court have determined the date ranges in the indictment were also legally sufficient, as a specific date range is not required in cases of sexual assault. We also find there was sufficient evidence to support Brown's convictions, and last, we find no plain error. Therefore the convictions are affirmed.

¶52. **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., McDONALD, LAWRENCE AND EMFINGER, JJ., CONCUR. WILSON, P.J., AND WESTBROOKS, J., CONCUR IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. SMITH, J., NOT PARTICIPATING.**